**Mary STRUNK, Plaintiff-Appellant,**

v.

**Margaret HECKLER,\* Secretary of Health and Human Services, Defendant-Appellee.**

**No. 82–3081.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1983.

Decided April 27, 1984.

---

\* The court has amended the name of the case by changing the name of the defendant from Rich-ard Schweiker to Margaret Heckler. *See* 42 U.S.C. § 405(g) and Fed.R.Civ.P. 25(d)(1).

**1358**

Jamie L. Weinberg, Bloomington, Ind., for plaintiff-appellant.

Steven J. Plotkin, Dept. of Health & Human Service, Regional Atty., Region V, Chicago, Ill., for defendant-appellee.

Before POSNER, COFFEY and FLAUM, Circuit Judges.

COFFEY, Circuit Judge.

This appeal challenges the Secretary of Health and Human Services' ("Secretary") decision denying the appellant's application for Supplemental Security Income Benefits. We affirm.

## I.

Mary Strunk, the plaintiff-appellant, filed an application for Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 1382(a) in December of 1979 alleging that she was disabled resulting from various medical problems.[1] At the time of her application, the plaintiff was a 49 year-old

---

1. Plaintiff had previously applied for SSI benefits in 1974, 1975 and 1978. These applications were denied.

female with a second grade education. She is apparently unable to read or write and her past work record consists of only two weeks employment as a hotel housekeeper.

After the denial of her application, the plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). At the hearing, the plaintiff was represented by a paralegal who presented evidence concerning plaintiff's physical and emotional problems through the plaintiff, the plaintiff's daughter and a friend. Because of the plaintiff's testimony concerning her low intelligence level, her nervous condition and the lack of relevant medical evidence supporting the same, the ALJ ordered a psychological and a psychiatric examination. Plaintiff's representative agreed to schedule the psychological examination and an I.Q. test, and the ALJ scheduled a psychiatric examination. These examinations and the I.Q. testing were performed and their results were added to the hearing record. After considering all of the evidence presented with the additional medical evidence, the ALJ found that the plaintiff had "the following impairments: seizure disorder, residuals of fractured ankle, mental retardation, anxiety disorder." In spite of this finding, the ALJ found that "[t]hese impairments, singly and in combination, do not significantly limit the claimant's ability to perform basic work-related functions of our economy" and thus were not of the required severity to warrant a finding of disability entitling her to SSI benefits. After completing the administrative review process, the plaintiff brought this action seeking judicial review of the Secretary's denial of her application, contending that the ALJ's decision was not supported by substantial evidence. The district court affirmed the decision of the Secretary and the plaintiff appeals.

The plaintiff now argues that the ALJ's decision that her impairments did not meet the required standard of severity to substantiate a finding of disability is contrary to the evidence. Our review of the ALJ's finding that Strunk was not disabled is limited to a determination of whether those findings are supported by substantial evidence when considering the record as a whole. *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir.1982). "Substantial evidence" means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). We must affirm if the record contains substantial evidence to support the ALJ's findings and there has been no error of law. *Schmoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir.1980); 42 U.S.C. § 405(g).

## II.

### A.

A claimant is disabled within the meaning of the Social Security Act only if he or she has a severe impairment. 20 C.F.R. § 416.920(c). An impairment is deemed severe if: 1) it is listed as an impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equal to a listed impairment; and 2) is expected to last for a continuous twelve-month period. 20 C.F.R. §§ 416.920(d), 416.909. However, the Secretary is only empowered to find that an impairment is severe if it "significantly limit[s] [one's] physical or mental abilities to do basic work activities." 20 C.F.R. § 416.921(a). "'Basic work activities' are defined as 'the abilities and aptitude necessary to do most jobs' —walking, standing, seeing, carrying out simple instructions, and so forth." *Wallschlaeger v. Schweiker*, 705 F.2d 191, 197 (7th Cir.1983) (quoting 20 C.F.R. § 416.921(b)). Furthermore, the impairments upon which an SSI application is based "must result from anatomical physiological or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.908.

### B.

The plaintiff's principal argument is that she is entitled to a determination of

disability because she qualifies pursuant to the conditions set forth in the Listing of Impairments for mental retardation. The plaintiff's main contention is that she qualifies for this determination because her 65 I.Q., based on intelligence test results, is within the 60–69 range specified in the Social Security Regulations as manifesting mental retardation. The plaintiff has failed to supply this court, nor have we found any case law requiring the Secretary to make a finding of mental retardation based *solely* upon the results of a standardized intelligence test in its determination of mental retardation. On the contrary, the regulations state:

> "The degree of impairment should be determined primarily on the basis of the intelligence level *and* the medical report. Care should be taken to ascertain that test results are consistent with daily activities and behavior."

20 C.F.R., Part 404, Subpart P, App. 1 § 12.00(B)(4) (emphasis added). Dr. Searle, the psychiatrist at a community mental health center who administered a standardized intelligence test to the plaintiff, made a finding that the plaintiff's I.Q. was below average. This finding was of little value as it did not include the quantum of medical evidence required to document whether the results of the intelligence test were consistent with the plaintiff's daily behavior. Specifically, in connection with her finding that Ms. Strunk's I.Q. was below average, Dr. Searle stated only that she "cannot read or write adequately and is unable to handle money, not knowing if she has been cheated." (Tr. 250). The ALJ analyzed the report and recognized the deficiency in Dr. Searle's report, stating that it was "not accompanied by a narrative psychological report." [2]

Dr. Kissel, the psychiatrist who subsequently examined the plaintiff at the request of the Secretary, made the required specific findings regarding plaintiff's mental condition, and extensively discussed her personal and medical history and current lifestyle in support of his findings. Based on his examination he estimated that her basic intellectual capacity was at an I.Q. level of 80–85, in contrast to the results of the intelligence test administered to the plaintiff by Dr. Searle. It is obvious from Dr. Kissel's conclusions regarding the plaintiff's intelligence level that he believed an I.Q. of 65, as determined by Dr. Searle's testing, was inconsistent with the psychiatric exam he administered. Dr. Kissel concluded that the plaintiff had a capacity for further formal education, had adequate emotional and mental capacity to perform in an unskilled job, and that her thinking processes and judgment were sufficient to allow her to manage her own money and he did not diagnose mental retardation.

The record also reveals that Dr. Wisen, who conducted a thorough neurological examination of the plaintiff at the Secretary's request relative to her claim of epilepsy, pointed out in his report of the interview and his evaluation that while the plaintiff claimed not to know what year it was or to be able to add $3 + 3$, she was able to discuss the fact that her rent of $150 per month was too high. Dr. Wisen noted that the plaintiff's "seeming 'inability' to answer simple questions is a contradiction to her normal ability of social interactions and conversation." (Tr. 237). It was Dr. Wisen's opinion that the plaintiff's answers to questions testing her fund of knowledge reflected "deliberate fabrication" and he thus concluded that she was a "pathological liar." (Tr. 237). Since the record contains conflicting medical evidence concerning the plaintiff's mental retardation and her credibility, the validity of her intelligence test scores and her testimony are questionable. After an independent review of the record of the evidence presented to the ALJ we hold that there is

---

**2.** Dr. Austin, the plaintiff's treating physician at the time of the hearing, stated that plaintiff was mentally retarded. There is no evidence in the record that he conducted any testing. He merely concluded that the plaintiff was "mentally retarded which will not improve also patient hasn't been educated enough to preform [sic] any duties—reading, counting, writing—can't tell time." (Tr. 242).

substantial evidence in the record to support his conclusion that there is more than sufficient evidence to find the plaintiff not mentally retarded to a degree sufficient to constitute a severe impairment within the meaning of the Social Security Act.

## C.

■ The ALJ also reasoned that even if the plaintiff's I.Q. was within the 60–69 range, she still would not be entitled to benefits as he found that she suffered from no other physical or mental impairment that imposed a significant work-related limitation of function as required by 20 C.F.R. Part 404, Subpart P, App. 1, § 12.-05(C). In this regard the plaintiff's epilepsy claim was primarily based on the testimony of witnesses who had allegedly observed her seizure episodes in the past. With regard to the medical evidence in support of her claim of frequent seizures, Dr. Waldo, a treating physician, wrote on an undated prescription blank that "Mrs. Strunk has an established diagnosis of epilepsy." He also stated in a hospital discharge summary for ingesting an overdose of epilepsy medication that Mrs. Strunk was a "known epileptic." Dr. Austin, another physician who treated the plaintiff since June of 1980, stated in a one-sentence letter to the ALJ that "[i]n my professional opinion Mary Strunk is unable to work because of nerve damage in her right foot due to cast pressure from a previous break and uncontrolled epilepsy." (Tr. 240). Subsequent to the hearing the plaintiff provided additional documentation in a form questionnaire from Dr. Austin. While Dr. Austin concluded the plaintiff was an epileptic, in response to a question on the form directing that he delineate the objective findings for his conclusions, he merely responded that it was "obvious from counsilation [sic] with patient." (Tr. 242). He failed to set forth any medical history data or information pertinent to Mrs. Strunk's present disability. "Any medical finding in the evidence must be supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.926(b). See also Peppers v. Railroad Retirement

Board, 728 F.2d 404, 406 (7th Cir.1983). The ALJ reasoned that Dr. Austin had failed to conduct any organic studies and relied instead on merely the plaintiff's recitation of her past condition.

At the Secretary's request a Dr. Wisen conducted a neurological examination of the plaintiff and reviewed her medical history and concluded that the plaintiff did not suffer from epilepsy, specifically stating that "the plaintiff's claim of frequent seizures is in doubt [due to] gross contradictions in her history." (Tr. 236). Dr. Wisen found "no factual basis in her claim of frequent seizure activity" and that "[h]er seeming inability to answer simple questions is a contradiction to her normal ability of social interactions and conversation." Based upon the conflicting medical evidence concerning plaintiff's epilepsy claim, the ALJ concluded that the plaintiff did not have seizures within the frequency range she described and that if she did, it was due to her failure (as documented in her medical history) to ingest her medication as prescribed.

The ALJ further concluded that the record was devoid of any diagnosis that the plaintiff was suffering from "some form of a mental illness." The ALJ noted that Dr. Searle "carefully refrained from any diagnosis except 'generalized anxiety disorder'" without specifying any "medically determinable impairment (illness) of either a mental or physical nature which prevented plaintiff from working." To the contrary, after his psychiatric examination of the plaintiff at the Secretary's request Dr. Kissel found that the plaintiff did "not manifest any significant emotional [or] mental disorder at the present time" and that no "specific psychiatric treatment" was required. In contrast to Dr. Searle's report he further found that the plaintiff did "manifest adequate mental and emotional capacity to perform an unskilled job, to cope with ordinary work pressure, and to communicate adequately and directly with co-workers and employers."

As to the plaintiff's ankle impairment resulting from a fracture, plaintiff's physician, Dr. Austin, concluded that she had a "25% motor loss of ankle function" due to nerve damage caused by the casting of her fractured ankle. However, he failed to provide any objective findings or medical documentation substantiating this conclusion made only five months after the cast was applied.[3] In contrast, during Dr. Kissel's psychiatric examination of the plaintiff some twenty months after the cast was applied, he observed that "she was active in walking" and that her gait appeared relatively normal. After weighing the conflicting testimony concerning the plaintiff's subjective complaints of ankle pain, and Dr. Austin's unsupported diagnosis of a 25% loss of ankle function, the ALJ found the medical evidence to support the finding of a severe impairment to be insufficient. The ALJ stated that Dr. Austin "apparently accepted the claimant as a reliable historian" with regard to her ankle as he had also done with regard to the "frequency and intensity of her seizures." It is proper for an ALJ to make credibility determinations concerning a claimant's representations concerning the severity of pain. *Bibbs v. Secretary of Health, Ed. and Welfare*, 626 F.2d 526, 528 (7th Cir.1980). Furthermore, "[t]he weight given a physician's statement depends upon the extent to which it is 'supported by medically acceptable clinical and diagnostic techniques.'" *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir.1982) (quoting 20 C.F.R. § 404.-1526(b)). *See also* 20 C.F.R. § 416.926. Dr. Austin's perfunctory statement was not "supported by [any] medically acceptable clinical and diagnostic techniques" and was of little value. The ALJ concluded that based on the conflicting medical evidence the plaintiff's ankle impairment failed to constitute a severe impairment that has lasted or will last for twelve con-

secutive months, as required in the Secretary's regulations.

We hold that there is substantial evidence in the record to support the ALJ's finding that based upon the conflicting medical evidence and the plaintiff's credibility, the plaintiff's ankle, seizure and mental illness impairments "singly and in combination, do not significantly limit the claimant's ability to perform the basic work-related functions of our economy" and thus were not of the required severity to entitle her to SSI benefits.

### III.

The plaintiff urges that we hold that she is disabled within the meaning of the Social Security Act irrespective of the ALJ's findings because her combined impairments are so severe that she is unable to do "basic work activities." The plaintiff contends that this conclusion can be arrived at by applying the medical-vocational guidelines set out in 20 C.F.R. Part 404, Subpart P, App. 2, considering the claimant's age, education, and work experience. We disagree. It is clear that before the medical-vocational guidelines can be applied to a given case, a claimant must prove that he or she suffers from a severe medically determinable physical or mental impairment. *Wallschlaeger v. Schweiker*, 705 F.2d 191, 196 (7th Cir.1983). *See also* 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(a); 20 C.F.R. § 416.920(c). Thus, the application of the medical-vocational guidelines to the plaintiff's claim is not warranted since the ALJ found her impairments not severe when considered singly or in combination, a finding we hold is supported by substantial evidence.

### IV.

The plaintiff finally argues that the ALJ did not fully and fairly develop the record with respect to the plaintiff's al-

---

**3.** We note that the ALJ in his decision mentioned that the plaintiff's hospital records did not reflect that her fractured ankle had been casted when in fact those records do state that a cast had been applied by a Dr. Ortegon. Dr. Austin, her treating physician, examined the fractured limb only five months after the casting and concluded that there was "25% motor loss of ankle function" due to nerve damage. We do not, however, find this oversight regarding the application of the cast to be material.

leged alcoholism and that the ALJ ignored evidence in the record demonstrating that she was in fact an alcoholic.[4] Contrary to the plaintiff's argument it is evident from a reading of the ALJ's decision that he did consider the medical evidence in the record dealing with the plaintiff's alleged alcoholism. In his decision the ALJ stated that he had "specifically considered the evidence in the record, although not adduced by the claimant, as to the claimant's drinking behavior." Furthermore, during the hearing the ALJ explicitly questioned the plaintiff concerning her drinking behavior and the plaintiff stated that she had stopped drinking. This was consistent with the plaintiff's previous statements to Dr. Searle. The plaintiff also told Dr. Kissel that while she had been a heavy drinker, she now only drank on occasion. It is interesting to note that Dr. Austin, her own treating physician, made no statement concerning the plaintiff's drinking problem nor did Dr. Wisen, who conducted a complete physical examination of the plaintiff in connection with her claim of epilepsy. The only medical evidence related to her present claim which she introduced in support of this alcoholism claim came from Dr. Ortegon, who treated the plaintiff for her ankle fracture. He noted that when the plaintiff was admitted to the hospital for the fracture she exhibited an "outward appearance of having ingested alcohol" and that she had a history of chronic alcoholism. He then diagnosed "acute alcoholism" without any further supportive explanation or findings consistent with the same and we are thus unable to ascertain the medical basis for his diagnosis. The ALJ was not required to give weight to Dr. Ortegon's unsupported diagnosis of alcohol addiction since it lacked the symptoms, signs and laboratory findings required to form the basis for any disability determination. *See* 20 C.F.R. § 416.925(e). With the exception of Dr. Ortegon, none of the physicians who exam-

ined the plaintiff in connection with her current SSI application made any diagnosis of a drinking problem. The ALJ specifically found that "there is no evidence which points to any conclusion except that the claimant is a voluntary drinker. She is not an alcoholic. She has not lost the voluntary capacity to control her drinking behavior which in turn undoubtedly exacerbates all other medically determinable impairments from which the claimant may suffer." We hold that there is more than substantial evidence in the record to support the ALJ's conclusion that the plaintiff was not addicted to alcohol at this time but rather would be considered as a voluntary drinker under control, and thus not entitled to SSI benefits.

■ With respect to the plaintiff's contention concerning the ALJ's failure to fully develop the record concerning her alleged alcoholism, we also hold that the record developed clearly demonstrates that the plaintiff was provided with a fair and adequate hearing concerning this claim. The ALJ went out of his way to initiate the questioning concerning her alcoholism after he determined that it could conceivably be an impairment in addition to the other impairments plaintiff submitted as the basis for her SSI application. We must comment that this is hardly consistent with plaintiff's argument portraying the ALJ as "totally unconcerned" with her alleged alcoholism. While the plaintiff argues that the ALJ should have ordered her to undergo further medical examinations to determine if she was in fact an alcoholic, we hold that the record is more than adequate and believe that any additional exams would have been unnecessary and merely cumulative.

## V.

■ In this case there was conflicting evidence submitted by medical experts con-

---

**4.** The plaintiff did not base her current SSI application on an impairment due to alcoholism. However, the medical evidence in the record does refer to the plaintiff's alleged drinking problem. This evidence includes the record of plaintiff's 1979 disability hearing conducted

by another ALJ and the plaintiff argues that this prior hearing evidence supports her current claim. We do not share her view. It is interesting to note that the ALJ did not find the plaintiff to be an alcoholic at that time either.

cerning the plaintiff's alleged impairments. However, it is the Secretary, not the courts, who must resolve conflicts in the medical evidence. *Hassler v. Weinberger*, 502 F.2d 172, 177 (7th Cir.1974). *See also Peppers v. Railroad Retirement Board*, 728 F.2d at 406 (7th Cir.1983) (Railroad Retirement Board disability determination). The ALJ "merely balanced conflicting evidence as any factfinder must do, and found that the medical evidence against a finding of disability outweighed the showing that the claimant was disabled." *Id.* "[W]e are not free to reweigh [disputed medical evidence] *de novo ....*" *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir.1982). The finding of the ALJ that the plaintiff is not disabled within the meaning of the Social Security Act is supported by substantial evidence in the record. We AFFIRM.