**Anthony M. MITCHELL, Plaintiff,**

v.

**Margaret HECKLER, Secretary of Health and Human Services, Defendant.**

**No. 83 C 5193.**

United States District Court, N.D. Illinois, E.D.

June 13, 1984.

Daniel Galatzer, Chicago, Ill., for plaintiff.

Donna Morros Weinstein, Regional Atty., Linda A. Wawzenski, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Anthony Mitchell ("Mitchell") seeks judicial review of a final decision of the Secretary of Health and Human Services ("Sec-

retary") denying Mitchell supplemental security income for a period of disability. Mitchell's claim under Social Security Act ("Act") §§ 216(i) and 1602, 42 U.S.C. §§ 416(i) and 1381a, was denied by Administrative Law Judge ("ALJ") Robert Cordek after a March 28, 1983 hearing. Mitchell then exhausted his administrative remedies (a process that resulted in the ALJ's decision becoming Secretary's) and brought this action against Secretary pursuant to Act § 205(g), 42 U.S.C. § 405(g).

As is customary in these cases, the parties have filed cross-motions for summary judgment. Although Mitchell's claimed disability involved physical and mental impairments, the essential issue on review is whether substantial evidence supports Secretary's decision as to the mental impairments.[1] For the reasons stated in this memorandum opinion and order, Mitchell's motion is granted (subject to the need for a limited remand) and Secretary's is denied.

### Facts

Mitchell was 28 years old at the date of the hearing. After completing high school and two years of college, he had held various unskilled jobs, including work as a meat mixer, mail room clerk and garage attendant.

Mitchell was shot in the head on October 2, 1979 during a robbery at his apartment. One month after undergoing brain surgery at Henrotin Hospital he was transferred to Illinois Rehabilitation Institute ("IRI"), where he remained until December 5, 1979, then continued his treatment as an outpatient. Mitchell returned to school full time in October 1981, at which time he was released from outpatient status. Mitchell contends the combined physical and mental impairments attributable to the gunshot wound rendered him "disabled" as defined by the Act. He claims eligibility for bene-

fits only for the closed period from October 2, 1979 to October 1, 1981.

Secretary found Mitchell's psychological impairments ("non-exertional limitations") did not significantly affect his capacity to perform light work, so Mitchell was not disabled (ALJ Findings 8, 13 and 14; R. 23 [2]). What the medical evidence in the Record shows is this:

On December 31, 1979 Dr. Steven Scheer, a specialist in physical medicine and rehabilitation and the attending physician who worked with Mitchell at IRI, reported Mitchell had the physical capacity to *perform medium work* (Ex. 12; R. 126–27). Dr. Scheer's April 24, 1980 recheck (Ex. 13; R. 128) reflected the following:

1. "[A]s of April, he is ready to return to work or at least to seek vocational counseling."

2. Though Mitchell had "normal speech and comprehension," Dr. Scheer believed a neuropsychological battery was indicated (apparently because of Mitchell's sluggishness in desiring to return to work).

3. Dr. Scheer "felt it a bit unjust" that Mitchell would not continue to receive benefits until he was able to receive an income.

On May 19, 1980 Dr. Scheer again reported Mitchell had the ability to perform medium work (Ex. 14; R. 129). Then on August 14, 1980 Dr. Scheer found (Ex. AC–1; R. 208):

1. Mitchell was independent in all self-care activities and able to return to work "when he is psychologically fit to do so."

2. Mitchell was "pursuing this [vocational] area slowly and methodically.... [H]e would like to return to work but wants until ... December 1980."

On November 19, 1980 psychologist Barry Rath ("Rath") administered Mitchell's first and only psychological testing. His

---

**1.** Mitchell's physical ability to perform light work is not disputed, nor does Mitchell now attack the ALJ's conclusion that seizures did not disable Mitchell. On both those points the ALJ's findings are supported by substantial evidence in the record.

**2.** "R.—" refers to pages in the administrative record (the "Record") filed with this Court. "Ex.—" refers to exhibits in the Record. "Tr.—" refers to pages in the transcript of the ALJ hearing (R. 34–65).

report (Ex. 32; R. 186–87), written in March 1981 and the following portion of which was relied on and quoted at length by the ALJ, says:

> Mr. Mitchell presents an essentially normal profile except for some moderate slowness in finger tapping speed bilaterally, decreased left hand grip, and questionable psychological adjustment. Other than the patient's finger tapping speed and mildly weakened left grip strength, all measures of motor speed, dexterity, and strength are within normal limits . . . . all sensory functions appear within normal limits . . . . good visual spacial skills. . . . [Mitchell] performed well on . . . complex problem solving . . . and remembered an average number of shapes employed from tactile cues. His recall of the spacial relations involved was mildly impaired. . . . Verbal subtests were within normal limits. . . . The patient's Performance scores were generally in the bright/normal range . . . . memory appears above average . . . . the patient has mild motor deficits but sensory and higher cognitive function appear average [or] somewhat above . . . . clearly this patient has good abilities. . . .

Rath's contemporaneous Behavioral Observations stated Mitchell was socially at ease, "basically cooperative and alert but slow to respond and mildly passively resistent [sic], . . . seemed generally unchallenged, unmotivated and uncomfortable." Mitchell reported to Rath "he was in no emotional distress."

What Mitchell urges as controlling here is Rath's description of Mitchell's Minnesota Multiphasic Personality Inventory profile ("MMPI"), which was wholly ignored by the ALJ:

> . . . an essentially schizoid personality style, marked by poor interpersonal relations, withdrawal, use of fantasy to avoid

stress, and the potential for serious personality decompensation in times of stress. The possibility of serious psychopathology is present and the patient may be prone to social withdrawal, and rapid and intensed [sic] mood swings.

Because that suggested serious psychopathology, Rath "strongly recommended" further psychotherapeutic and psychodiagnostic contact.

Dr. Scheer's April 10, 1981 report (Ex. 32; R. 188) reflected his own changed diagnosis in light of the Rath report. Citing the recently-tabulated MMPI result, Dr. Scheer now believed Mitchell's "seemingly sluggish attempt to return to Vocational Counseling was based on his psychological need for further therapy." Consequently Dr. Scheer considered Mitchell "would certainly be a good candidate for Vocational Counseling if and when he does adapt psychologically to his injury." In the meantime Dr. Scheer was prepared to recommend Mitchell's restoration to benefits.[3]

On May 27, 1981 Mitchell was interviewed by Dr. Richard Brady, a psychiatrist called in for consultation by the Illinois Bureau of Disability Adjudication Services. Dr. Brady's report (Ex. 34; R. 192–93) reflected Mitchell's complaints as mental fatigue, difficulty in socializing, angry and depressed mood, and difficulty in concentrating. Dr. Brady judged Mitchell's mood as "moderately depressed, moderately angry, mildly irritable," with an affect similarly "mildly irritable and blunted." After reviewing questions and answers reflecting "above average" intelligence, Dr. Brady estimated Mitchell's "attention and concentration to be mildly impaired." Based solely on the interview and without having conducted any formal psychological testing (and with no indication he was at all

---

**3.** On May 5 Dr. Scheer telephoned a Social Security Administration Adjudicator, responding to an inquiry prompted by that recommendation. Dr. Scheer's statement (Ex. 33; R. 191) repeated his opinion of Mitchell's mental impairment and added he felt because "the feelings [mood swings, insecurity, and discomfort] were probably planted within him by the head injury

that he be given some support in financial form." In a July 14, 1981 open letter (Ex. AC–2; R. 209) Dr. Scheer wrote, "These problems may well and indeed probably do relate to his injury." Dr. Scheer repeated Mitchell should have supplemental funding "until such time as he can become more comfortable with his situation and vocational counseling can be instituted."

aware of what Rath had done in that respect), Dr. Brady concluded:

> [Mitchell] has a severe impairment. However, he should be able to: perform simple, routine, repetitive tasks at a competitive rate with a normal amount of supervision; understand, carry out and remember instructions; respond appropriately to supervisors and coworkers and respond appropriately to customary work pressures in a routine work setting.

Thereafter Rath noted Mitchell's "slow but consistent progress" as a result of his therapy (Ex. 32; R. 189). In October 1981 Rath found Mitchell's regularly scheduled psychotherapy since May had "worked through and resolved most of his anger at his treatment, depression, fear, isolation, and inactivity" as a result of his "good motivation and follow-thru" (*id.* at 190). Finally Dr. Brady's report of a second interview later in October (Ex. 35; R. 197–99) reflected much the same procedure and determinations Dr. Brady had reported in the May interview, with a diagnosis of "Organic Brain Syndrome, Mild."

At the ALJ hearing Mitchell described his psychological problems in terms of his having been "very afraid to deal with people ... very insecure ... very moody ... mood swings ... depressed ... [and unable to] deal with stress at all" (Tr. 11; R. 46). In explaining his fear of people Mitchell said he "wasn't able to have contact with them at a great length of time" without withdrawing—staying completely away from them (Tr. 15; R. 50). During the period from April 1980 to October 1981 he often cried about his situation (often about ten times a week); once he thought of suicide (Tr. 15–16; R. 50–51). As for his inability to deal with stress, he "could not deal with the waiting and the officers and the people ... the bureaucracy," the delays and being treated "as a number" (Tr. 16; R. 51). As a result he "became very angry and ... would leave because [he] just couldn't do anything anymore" (*id.*).

### Existence of a "Disability"

Mitchell qualifies for supplemental security income if he sustained at least a one-year "disability" as defined by Act § 223(d)(2)(A), 42 U.S.C. § 423(d)(2)(A):

> [A]n individual ... shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy....

ALJ Cordek found Mitchell did suffer from a severe impairment, but was nonetheless capable of performing light work within one year after sustaining his gunshot injury. Mitchell's age and education, if coupled with the capacity to perform light work, required a finding he was "not disabled." See 20 C.F.R. Part 404, Subpart P, App. 2, Table 2, § 202.20.

Mitchell argues the finding of his ability to perform light work is without substantial support in the record. Substantial evidentiary support is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting from *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). Such evidence must support not only (1) Mitchell's physical ability to exert himself to the extent required to perform light work but also (2) the absence of any non-exertional limitation (such as a psychological problem) that prevented Mitchell from performing "substantial gainful work." See *Smith v. Schweiker*, 735 F.2d 267 at 271 (7th Cir.1984).

More specifically, Mitchell challenges the ALJ's conclusion his non-exertional emotional disorder was not disabling. While Secretary concedes she must evaluate whether Mitchell's non-exertional impairment diminished his ability to do work, she has utterly failed to deal with it on its own terms. Rath and Dr. Scheer found—based on testing as well as observation—Mitchell's emotional disorder prevented him from functioning effectively in society. In eval-

uating those determinations the ALJ stated only (R. 21–22):

1. Mitchell admittedly had a schizoid personality, but he "performed well on tests relevant to his ability to work," as reflected by his problem-solving skills and lack of sensory disorders.

2. Dr. Brady recognized Mitchell's emotional disorder but nonetheless found "he would be capable of handling the demands of unskilled work."

3. Mitchell "benefited considerably from his psychotherapy," especially around October 1981.

That evaluation missed entirely the point of Rath's psychological examination of Mitchell, and in fact ALJ Cordek's three separate responses serve to illustrate the total lack of evidence in support of the ALJ's position.

■ ALJ Cordek's first comment partakes of amateur medical diagnosis. Admittedly an ALJ is not permitted to second-guess the meaning of a clinical test, because he is not a doctor. *Whitney v. Schweiker,* 695 F.2d 784, 788 (7th Cir.1982). There is no reason the rule should be any different for mental than for physical tests. Moreover the ALJ's statement betrays a logical fallacy. MMPI is a massive test designed to detect a variety of mental disorders. Here the ALJ impermissibly invoked favorable components of the MMPI's results to support his conclusion that a separate unfavorable result did not indicate a serious problem. While of course a sensory disorder (say a patient's visual sensorium was clouded, so he or she literally felt "in a fog") can constitute a disability, the lack of such a disorder does not lead to or even support a conclusion that a second unrelated disorder (schizophrenia in Mitchell's case) is not disabling. *See Montijo v. Secretary of HHS,* 729 F.2d 599, 602 (9th Cir.1984).

■ ALJ Cordek's second comment invokes the conclusion of Dr. Brady, who (surprisingly, given his area of specialty) engaged in analysis (or lack of analysis) similar to that of the ALJ by concentrating on mental disorders Mitchell did *not* have. Reviewing courts may require Secretary to give little weight to record medical findings if:

1. the doctor making the findings had inadequate exposure to the patient, *Allen v. Weinberger,* 552 F.2d 781, 785–86 (7th Cir.1977); or

2. the findings are not "supported by medically acceptable clinical and laboratory diagnostic techniques," 20 C.F.R. § 416.926(b); *Strunk v. Heckler,* 732 F.2d 1357 at 1361–1362 (7th Cir.1984).

Both those reasons operate here to require that Dr. Brady's opinion be given little weight:

1. Though Dr. Brady "examined" Mitchell twice rather than a single time (the paradigm case for application of *Allen*), each examination was nothing more than a face-to-face interview. Indeed one of those interviews took place *after* October 1, 1981, when the asserted disability had ended. Thus only one interview is relevant to the claim (paralleling the paradigmatic case). And even were that not the case, two such conversational interviews can hardly rise to the level of a single thorough physical (or mental) examination.

2. Dr. Brady employed no techniques that might be considered "medically acceptable clinical [or] laboratory diagnostic techniques." He only quizzed Mitchell on mundane topics such as the names of recent Presidents. There was nothing in either of his reports that even adverted to, let alone sought to resolve, the disabling factor of Mitchell's schizophrenia.[4]

---

**4.** Nothing in his reports hints Dr. Brady was even aware of the MMPI and of Rath's findings and diagnosis. Though speculation is inappropriate (this Court should not indulge in amateur diagnosis any more than the ALJ), had he been aware of the MMPI Dr. Brady need not have administered additional tests of his own, but might have provided his own analysis of the test results. Moreover the disadvantages of Dr. Brady's very limited exposure to Mitchell might then have dissipated as well, for by availing himself of the MMPI results Dr. Brady could

But perhaps most vitiating to any possible impact of Dr. Brady's findings is that his first examination of Mitchell did not occur until the end of May 1981 (as already indicated, his second occurred after the claimed disability had concededly ended). Even if valid Dr. Brady's opinion could not establish Mitchell was disabled for a period of less than one year. In short, Dr. Brady's findings cannot fairly be given controlling (or even meaningful) weight by the ALJ.

ALJ Cordek's final comment about Mitchell's recent improvement does not negate—in fact it may confirm—that a disability preceded that improvement. Mitchell was shot in the head, then claimed to have psychological problems for a two-year period during which he did not perform gainful activity. During the last six months of that period he underwent psychotherapy from which he claims to have benefited, and he returned to college thereafter. That sequence of events, without more, provides strong support for the existence of a disability during the two years in question (and that is precisely the thrust of Rath's findings, as the following discussion demonstrates).

Of course a lack of evidence supporting Secretary's position may not be enough. It should be asked whether the evidence supporting *Mitchell's* position is substantial enough to require reversal. After all substantial evidence determinations must be made with reference to the record as a whole. *Strunk*, at 1359. In his own behalf Mitchell has invoked the findings of his psychotherapist Rath and his physician Dr. Scheer, both of whom rely on Mitchell's MMPI results. Mitchell's own testimony corroborates those findings.

Rath's reports plainly reflect he viewed Mitchell as disabled. Rath said Mitchell had "serious psychopathology" and "strongly recommended" continued psychotherapy. That is as strong an opinion as a professional can give in good conscience, especially in the field of psychology where prediction of actual behavior is so risky.

True enough Rath expressed no conclusion on the ultimate issue whether Mitchell had a "disability," but in this Circuit professional opinions are entitled to weight *despite* their attempts to pass judgment on legal issues, not *because* of those attempts. See *Allen*, 552 F.2d at 785.

Dr. Scheer's opinion is also entitled to be weighed in Mitchell's favor. It is true Scheer initially thought Mitchell may have been malingering. But as ALJ Cordek recognized, Scheer changed that view entirely (recognizing his understandable earlier error) when he obtained psychological data on Mitchell. Nor did the ALJ rely at all on Dr. Scheer's earlier thoughts, instead resting on the ALJ's three comments already discussed. And any contention Scheer's later opinion was not sufficiently definitive to support Mitchell's entitlement to benefits is dispelled by the ALJ's characterization of that opinion (R. 21):

> The record does indicate that Dr. Scheer decided in a May 5, 1981 report (Ex. 33) that the claimant needed psychotherapy in order to return to work.

▮▮▮ Finally, a claimant's own testimony (though of course not controlling) may be especially important when a mental disability is asserted. As the factual discussion in this opinion reflects, Mitchell's testimony corroborates the findings of Rath and Dr. Scheer in every relevant aspect. It clearly depicts a person who, during the period when the described pattern existed, could not have held down any kind of regular job. Yet the ALJ never rejected that testimony as incredible or even dubious, let alone giving reasons for doing so. To the contrary, the testimony is wholly credible in light of the Rath description of Mitchell's MMPI profile. Even though the ALJ need not comment on all evidence in the record, he should comment on testimony of the claimant if it strongly supports a contrary conclusion to his own. *Zblewski v. Schweiker*, 732 F.2d 75, 78–79 (7th Cir. 1984).

---

have obtained the benefit of many hours of exposure to Mitchell's psychological problems.

But as things stand Dr. Brady's reports cannot be viewed as substantial evidence.

*Disposition*

■ There is no substantial evidence to support any conclusion other than that Mitchell was disabled. This case is like *Smith* in that Secretary failed to give proper consideration to evidence of a non-exertional impairment. In *Smith* however consideration of the claimant's impairment gave rise to the possibility there might exist work in the national economy not inconsistent with the presence of the claimed impairment. Thus *Smith* remanded for development of that possibility. Here by contrast Secretary has offered nothing to show there are jobs appropriate for people unable to function in society because of a mental disorder such as Mitchell's. Mitchell's disability is a necessary consequence of a finding supporting the presence of his mental impairment.

■ However a limited remand is necessary to determine the date by which Mitchell's disability had ceased. *All* the evidence shows Mitchell was still disabled at least through April 1981[5] and almost certainly at least into July 1981.[6] At the other end of the time range, it is also clear Mitchell is not entitled to benefits after October 1981, for he returned to school at that time and does not seek benefits beyond that date. Unless the parties reach agreement on the issue, the termination date must be resolved.

*Conclusion*

There are no disputed issues of material fact except for the date of termination of Mitchell's disability, and Mitchell is entitled to a judgment as to Secretary's liability as a matter of law. Mitchell is entitled to benefits for a period of disability from October 1979 through at least April 1981. This case is remanded:

1. with a direction that Secretary promptly pay Mitchell benefits through April 1981; and

2. for a hearing before an ALJ other than ALJ Cordek, with a direction to determine within 91 days from the date of this order the termination date of Mitchell's period of disability.

Secretary's motion for summary judgment is of course denied.

---

5. Even Dr. Brady's first report, which is itself inadequate for the reasons previously discussed, was not issued until late May 1981 in any case.

6. At that time Rath was reporting Mitchell's slow and steady progress, but not a termination of the disabling problem.