**Emilia PREDKI, Plaintiff,**

v.

**Margaret HECKLER, Secretary of Health and Human Services, Defendants.**

**No. 83 C 4482.**

United States District Court, N.D. Illinois, E.D.

Sept. 10, 1985.

---

## MEMORANDUM OPINION
## AND ORDER

ROVNER, District Judge.

Plaintiff-appellant, Emilia Predki, has appealed for judicial review of the final decision of the defendant-appellee, Margaret

Heckler, Secretary of Health and Human Services ("Secretary"), denying the plaintiff's application for disability and disability insurance benefits pursuant to Title II, sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i), 423 (1982). The parties have filed cross motions for summary judgment.

For the reasons set forth below, this Court reverses the decision of the Secretary and remands the case for further fact findings.

## I. *History of Proceedings*

On November 3, 1981, the plaintiff applied to the Social Security Administration ("SSA") for a period of disability and for disability insurance benefits. Plaintiff claims that she suffers from lupus syndrome, ventricular tachycardia, and Barlow's Syndrome, and that she lives under the threat of severe ventricular arhythmias and the possibility of sudden death. The plaintiff's application was denied initially on March 9, 1982 (R. 65), and again on reconsideration on April 28, 1982. A hearing was conducted on January 10, 1983 before an administrative law judge ("ALJ"). The ALJ denied plaintiff's claim on February 22, 1983.

In his decision denying disability benefits, the ALJ determined initially that the claimant is unable to perform her past relevant work. The ALJ also found, however, that the plaintiff was not under a disability and that she maintains the capacity to perform a full range of light work. The plaintiff sought review of the ALJ's decision by the Social Security Administration Appeals Council. The Appeals Council denied review, which renders the ALJ's opinion the final decision of the Secretary. The plaintiff then filed a timely request for federal judicial review pursuant to 42 U.S.C. § 405(g) (1982).

## II. *Review of the Evidence*

The plaintiff, Emilia Predki, was fifty years old at the time of the hearing. She was born in Poland and received a high school education in Africa. The plaintiff came to the United States in 1952 and thereafter learned English by listening. Although she can read and write, the plaintiff testified that she misses a few words and that she has trouble spelling. The plaintiff was employed first in quality control at a television factory and later she worked as a bindery worker. The defendant's vocational expert characterized these jobs as semi-skilled (R. 9).

Plaintiff claims that she has been disabled since April of 1981 because she suffers from several serious diseases. First, plaintiff claims that she has lupus syndrome, because she suffers pain and swelling in her arms and hands. Systemic lupus erythematosus is an inflammatory connective tissue disorder. *The Merck Manual* at 1207 (14th ed. 1982). As the medical evidence shows, however, plaintiff does not suffer from systemic lupus erythematosus but rather she suffers only from drug-induced lupus syndrome (R. 104, 112, 133, 134, 137). Next, plaintiff complains that she suffers from Barlow's syndrome, or mitral prolapse syndrome. Prolapse of the mitral valve is a chronic heart valve disease "now recognized as a common and sometimes serious and progressive lesion." *The Merck Manual* at 526 (14th ed. 1982). Plaintiff also suffers from ventricular tachycardia. This disease is defined as "an abnormal rapid beat of the heart, from 150 to 200 beats per minute, associated with minor irregularities of the rhythm." *3 Schmidt's Attorney's Dictionary of Medicine* at V–50 (1979). Finally, plaintiff claims that she lives "under the threat of severe ventricular arhythmias and the incidence of sudden death." Arhythmia is the loss of or variation in the normal rhythm of the heart beat, resulting in, *inter alia,* fast beats. *3 Schmidt's Attorney's Dictionary of Medicine* at A–274 (1979).

The medical evidence begins with the records of Memorial Hospital of Elmhurst. The plaintiff was hospitalized on January 16, 1979. She complained of syncope (fainting) preceded by moments of dizziness. An electrocardiogram given to the plaintiff confirmed the presence of ventri-

cular tachycardia. The plaintiff was released on January 23, 1979, put on medication, and advised to avoid excessive activity (R. 130).

The plaintiff was again hospitalized at Memorial Hospital in July of 1979 due to complaints of syncope (R. 126). The treating physician at Memorial Hospital, Dr. J.M. Stoker, M.D., diagnosed the plaintiff as having ventricular tachycardia, documented at a rate of 210, and possibly having Barlow's Syndrome. Dr. Stoker then advised that the plaintiff be transferred to the Arhythmia Unit of Northwestern University Medical Center for evaluation and therapy by Dr. Martin Grais, M.D., a cardiologist (R. 126–127, 129).

The records at Northwestern Hospital noted that the plaintiff continued to have persistent syncopal episodes while on antiarhythmic therapy. She was suffering from paroxysmal ventricular tachycardia (R. 98). While at Northwestern Hospital, the plaintiff underwent an echocardiographic test which showed that plaintiff also suffered from Barlow's syndrome (R. 101). In a letter to Dr. Stoker, dated August 9, 1979, Dr. Grais reported that the plaintiff remains asymptomatic and has no augmentation of arhythmia (R. 101). Dr. Grais also noted the possibility of lupus in view of the plaintiff's intake of Pronestyl. Dr. Grais determined that the plaintiff could be discharged for outpatient follow up. The plaintiff subsequently was discharged but remained on medication, including Pronestyl and Inderal, in order to control her tachycardia (R. 99).

The plaintiff was hospitalized again at Northwestern Hospital on April 5, 1981, complaining of transient joint symptoms in the knees, wrists, and shoulders (R. 103, 112). Dr. Grais determined that the plaintiff had a reaction to the drug Pronestyl, which caused the plaintiff to develop a lupus-like syndrome (R. 104). This lupus-like syndrome was documented by a positive ANA test. Consequently, she was taken off Pronestyl in April of 1981 (R. 103).

In November of 1981, Dr. Stoker reported that the plaintiff had been free of signif-

icant syncope episodes (R. 104). Furthermore, Dr. Stoker noted that the plaintiff had tolerated the omission of the drug Pronestyl but "subsequently has had a general fatigue feeling and has some residual arthritic symptoms although the Lupus status is gradually clearing". He also noted, however, that plaintiff carries a continual long-term risk of syncope or serious cardiac arhythmia. She is on high doses of Inderal which has a sedative and depressing effect, but the use of adequate medication is extremely important. Dr. Stoker also noted that there is a potential risk that heavy physical or stressful situations would subject plaintiff to serious arhythmias. In his November, 1981 letter, Dr. Stoker concluded that "the only practical employment situation for her would be near her home ... in situations of strictly office or clerical and minimum stress activity" (R. 104).

In December of 1981, the Illinois Bureau of Disability Adjudication Services referred plaintiff to a Dr. Bacalla, M.D. (R. 105). After examining plaintiff, Dr. Bacalla reported that the heart rate was normal and that there were no gross cardiomegaly or murmurs (R. 107). Dr. Bacalla did find sinus bradycardia, which is a slowness of the heart beat due to a disturbance in the right atrium of the heart; 3 Schmidt's Attorney's Dictionary of Medicine at B-76 (1979). While he observed some soft tissue swelling and tenderness of the hands, there were no joint deformities noted. Dr. Bacalla did not diagnose arhythmia. Moreover, Dr. Bacalla did not offer any evidence or make any statements regarding the plaintiff's functional capacity to work.

The administrative record also includes a letter written by Dr. Stoker on January 18, 1983, which the ALJ did consider in making his determination (R. 135–136). For four years, Dr. Stoker was plaintiff's treating physician. Dr. Stoker reported that the plaintiff is subject to increasing or changing susceptibility to ventricular irritability even though at times in the past her condi-

tion has been under control. Dr. Stoker further reported:

> At this time, she is manifesting increased ventricular extrasystoles and the history strongly supports an episode of fainting with symptoms compatible with a return of at least short bouts of tachycardia. Mrs. Predki continues on extremely high doses of the beta-blocker medication called ... Inderal, and this continues to have a sedative effect and has a slowing effect on her basic heart rate and a tendency to drop her blood pressure. All of the above side effects must be accepted in the treatment program and contribute to her reduced functional status (R. 135).

Dr. Stoker further advised that the only kind of work situation of which plaintiff is capable would be clerical-type work in her home. The basis of this evaluation is that the plaintiff lives under the threat of severe ventricular arhythmias and the incidence of sudden death (R. 135). The risk of sudden death is enhanced by increased heart irritability "which could be a result of unusual physical activity, increased metabolic changes such as high fever or even the stress of mental aggravation or strain" (R. 135). In other words, in order to prevent and control the risk of these serious illnesses, not only does the plaintiff have to be on high dosages of medication, but her physical environment must be strictly controlled. Finally, Dr. Stoker also stated that the plaintiff's condition "has to do with a possible gradual degeneration of the collagen disease in the heart muscle and valves," and that with the passage of time, the plaintiff will need regular follow-up examinations and "possibly the use of more and newer suppressive medication" (R. 135).

In addition, the plaintiff testified regarding her symptoms and diseases at the administrative hearing. The plaintiff stated that she was unable to work after April of 1981 (R. 38). She testified that she had pain in her chest and that her arm was swollen. She was unable to walk because her entire body was in pain. She stated that although she could move her arm, if she reached for too long a period of time, she would get dizzy (R. 39). Plaintiff also testified that she suffered fatigue because of her chest pains. In a period of six months, the plaintiff stated that she had fainted twenty times.

With regard to her residual functional capacity, the plaintiff testified that she was told by her doctor not to lift heavy articles or shovel snow and that she was to rest (R. 45). Plaintiff also stated that she can do only some housework for ten to fifteen minutes before she becomes fatigued and must sit or lie down. Furthermore, during the summertime, she can do housework for only five minutes at a time (R. 46). Plaintiff testified that she cannot work at all because she gets tired very fast and gets dizzy soon afterwards (R. 47). Finally, the plaintiff stated that the medication she takes makes her drowsy (R. 48).

### III. *Establishment of Disability*

In order to qualify for a period of disability and for disability insurance benefits, an applicant must:

a. be insured for disability insurance benefits;

b. not have attained the age of 65;

c. have filed an application for disability insurance benefits; and

d. must be under a disability as defined in the Act.

42 U.S.C. § 416(i), 42 U.S.C. § 423 (1982). Plaintiff met the necessary earnings requirements for disability insurance at the time of her application in April of 1981 and continued to meet them at least through December, 1984 (R. 8). Since the plaintiff has fulfilled the requirements listed under a, b, and c, the only issue is whether the plaintiff is disabled.

To be found disabled under the Social Security Act, a claimant must prove the existence of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous twelve month period. 42 U.S.C. § 423(d)(1)(A) (1982). Furthermore, the claimant must prove that because of the

impairment, she is unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(2)(A); *Lovejoy v. Schweiker*, No. 80 C 5295, Mem. Op. at 7 (N.D.Ill. June 9, 1983).

The Secretary has issued regulations which provide a five-step sequential evaluation procedure to determine whether a claimant is eligible for disability benefits. 20 C.F.R. § 404.1520 (1985); *Krapfl v. Heckler*, No. 83 C 7188, slip op. at 3 (N.D. Ill. May 9, 1985), *appeal filed*, No. 85–1968 (7th Cir. June 21, 1985). The five inquiries of this evaluation are:

1.  whether the claimant is currently engaged in substantial gainful employment. If it is found that the claimant is currently working, then he will not be found disabled. If the claimant is not currently working, then the second inquiry is considered.

2.  whether the claimant does not suffer from such an impairment. If the claimant does not suffer from such an impairment, the claim is denied. If a severe impairment is present, then the third part is,

3.  whether the impairment meets or equals one of the impairments listed in Appendix 1, 20 C.F.R. part 404, subpart P, Appendix 1 (1985). If it does meet or equal one of the impairments, then the claimant will be considered disabled. If it does not, then the fourth inquiry is,

4.  whether the claimant's impairment prevents him from performing his past work. If the claimant is capable of returning to his past relevant work, then the claim is denied. If the claimant is not capable of returning to his past work, then the fifth and final inquiry must be examined.

5.  whether the claimant is capable of performing some other type of substantial gainful activity considering his age, education, and prior work experience. If he is not, then the claim is approved.

*Krapfl v. Heckler*, No. 83 C 7188, slip op. at 3.

In his sequential evaluation of the plaintiff's claim, the ALJ found that 1) the plaintiff suffered from ventricular tachycardia with Barlow's Syndrome; 2) the plaintiff's testimony and medical records indicate that the plaintiff's arthritic problems are not serious and that the plaintiff's complaints of weakness, chest pain, tiredness and nervousness are not credible and are not borne out by the necessary medical documentation; 3) the plaintiff is unable to return to her past relevant work; 4) the plaintiff, however, has the residual functional capacity to perform a full range of light work; and 5) considering her residual capacity, age, education, and work experience, the plaintiff is not disabled (R. 12). Therefore, the ALJ found that the plaintiff was not under a disability as defined in the Social Security Act (R. 12).

The final decision of the Secretary is reviewable under 42 U.S.C. § 450(g) (1982). The reviewing court, however, does not decide the case *de novo*. *Krapfl v. Heckler*, No. 83 C 7188 slip op. at 2. Rather, the issue before the court is whether the Secretary's findings of fact are supported by substantial evidence. *Whitney v. Schweiker*, 695 F.2d 784, 796 (7th Cir.1982); *Krapfl v. Heckler*, No. 83 C 7188, slip op. at 2. In order to determine if substantial evidence exists to support the ALJ's conclusions, the court must examine the record as a whole. *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir.1984); *Jackson v. Heckler*, 592 F.Supp. 1124, 1127 (N.D.Ill.1984), *quoting Strunk v. Heckler*, 732 F.2d 1357, 1369 (7th Cir.1984). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir.1984). If the court finds an error of law or that the record lacks substantial evidence to support the factual findings, then the court need not uphold the Secretary's decision. *Taylor v. Schweiker*, 739 F.2d 1240, 1241 (7th Cir. 1984).

Having reviewed the decision of the ALJ and the record as a whole, this Court finds that the ALJ's decision is not supported by substantial evidence.

## A. *Appendix 1 Listings*

Since the plaintiff is not currently working and the ALJ found that she does suffer from a severe physical impairment, the Court's initial inquiry is whether the impairment meets or equals one of the impairments listed in Appendix 1. Appendix 1 of the Secretary's Regulations provides a Listing of Impairments which are considered severe enough to automatically qualify a person as disabled. 20 C.F.R. part 404, subpart P, app. 1 (1985). The required level of severity for each impairment is also shown. 20 C.F.R. § 404.1525(c) (1985). Furthermore, in each section of the Listing of Impairments, certain specific medical findings are required to establish the existence of each impairment. 20 C.F.R. § 404.1525(c) (1985). Section 404.1520(d) of the Regulations provides that claimants may be found disabled if their impairments are either listed in Appendix 1, or are determined to be medically equivalent to a listed impairment. 20 C.F.R. § 404.1520(d) (1985).

■ Plaintiff argues that several of her impairments meet or equal impairments listed in Appendix 1. First, plaintiff claims that she suffers from mitral prolapse or Barlow's syndrome, which is listed at section 4.02(C) of Appendix 1. To satisfy section 4.02(C) of the Listing of Impairments, a claimant must have both congestive heart failure and "persistent mitral type heart involvement." Plaintiff, however, has denied having congestive heart failure (R. 105), and no medical findings were submitted to support a diagnosis of congestive heart failure. Thus, plaintiff is not disabled under section 4.02(C) because of her Barlow's syndrome.

■ Second, plaintiff complains that she suffers from lupus syndrome and therefore is disabled under section 10.04 of the Listing of Impairments, 20 C.F.R. part 404, subpart P, Appendix 1, Part A (1985). Sec-tion 10.04 lists the impairment "disseminated lupus erythematosus," which is a connective tissue disorder. As the Secretary appropriately noted, however, plaintiff's physician has described her condition as a "Pronestyl (drug) induced lupus syndrome" or a "Pronestyl lupus-like reaction." (R. 104, 112, 133, 134, 137). Medical sources distinguish drug-induced lupus from the inflammatory connective tissue disorder systemic (disseminated) lupus erythematosus, which is listed in Appendix 1. *The Merck Manual* at 1207 (14th ed. 1982). Therefore, although plaintiff had a positive ANA reading in 1980 which establishes a diagnosis of lupus (R. 120), her condition does not meet the Listing of Impairments under Appendix 1 because she has not been diagnosed as having disseminated lupus erythematosus.

■ Section 4.05 of Appendix 1 addresses another of plaintiff's impairments: arhythmias. Section 4.05 requires recurrent arhythmias resulting in uncontrolled episodes of cardiac syncope and documented by resting or ambulatory (Holter) electrocardiogram. 20 C.F.R. part 404, subpart P, Appendix 1, § 4.05 (1985). The evidence contains a great deal of medical opinion that the plaintiff lives under the severe threat of arhythmias (R. 104, 135). But although Dr. Grais notes that plaintiff takes medication to control her arhythmatic condition (R. 103), no formal diagnosis of this disease has been made. Furthermore, no arhythmias were noted on an electrocardiogram conducted by Dr. Bacalla (R. 107). Therefore, plaintiff cannot be disabled pursuant to section 4.05 of the Listing of Impairments.

In sum, none of plaintiff's physical impairments meets or equals one of the impairments listed in Appendix 1. Thus, she is not automatically disabled under the Regulations and this Court must review the ALJ's findings in the next steps of the sequential evaluation.

## B. *Residual Functional Capacity to do Light Work*

Since the plaintiff's impairments do not meet or equal the impairments listed in

Appendix 1, according to the fourth step of the sequential evaluation, the next inquiry is whether the claimant's impairment prevents her from performing her past work. *Krapfl v. Heckler*, No. 83 C 7188 Mem. Op. at 3. Although he gave no rationale, the ALJ did find that "the claimant is unable to perform her past relevant work as a bindery worker or in quality control" (R. 12). "Once such a determination is made, the burden shifts to the Secretary to prove that there is some other kind of substantial gainful employment available which the claimant would be able to perform," considering the claimant's age, education, and prior work experience. *Smith v. Heckler*, 582 F.Supp. 1529, 1530 (N.D.Ill.1984). The fifth and final inquiry of the sequential evaluation mandates approval of a disability claim if the claimant cannot otherwise be gainfully employed. 20 C.F.R. § 404.1520 (1985).

The ALJ held that while the plaintiff could no longer perform her past relevant work, she could perform a full range of light work (R. 12). The light work definition in the regulations provides that:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b) (1985).

After finding the plaintiff capable of performing a full range of light work, the ALJ applied the Appendix 2 grids to this case and held that Rule 202.11 dictates a finding that the claimant is not disabled (R. 12); *see* 20 C.F.R. part 404, subpart P, Appendix 2 (1985). "The Appendix 2 Guidelines indicate in grid form whether a significant number of jobs exist in the national economy for individuals with various impair-

ments of physical capacity, ages, education, and work experience." *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir.1984). An individual's characteristics correspond to the factors listed on the grids or charts, and by reading the grid under the appropriate work limitation, the guidelines will direct a finding of disabled or not disabled. *Id.* at 270. Thus, the reasonableness of a determination of disability based on the grids is only as correct as the accuracy of the underlying criteria, including work capacity.

■ Based upon the record, however, this Court is compelled to hold that the ALJ's finding that the plaintiff has the residual functional capacity to perform light work is not supported by substantial evidence.

Courts have held that where the treating physician states that the plaintiff is disabled as a result of his or her impairments, and no other physician makes any assessment of the plaintiff's residual functional capacity, then an ALJ's determination that plaintiff is capable of light or sedentary work is not supported by substantial evidence and must be reversed. *E.g., Kail v. Heckler*, 722 F.2d 1496 (9th Cir.1984); *Carroll v. Secretary*, 705 F.2d 638 (2d Cir. 1983); *Perez v. Schweiker*, 653 F.2d 997 (5th Cir.1981). *See also Spencer v. Schweiker*, 678 F.2d 42 (5th Cir.1982) (medical opinion on which ALJ relied was ambiguous regarding the plaintiff's residual functional capacity). In *Kail*, for example, it appeared that the ALJ had relied primarily on a report by a Dr. Weese, who made a thorough diagnosis of the claimant's condition but expressed no opinion regarding the claimant's residual functional capacity. One of the claimant's treating physicians had rendered an opinion that the claimant was permanently disabled due to his lung condition. *Kail*, 722 F.2d at 1497. The court held that the ALJ's finding that the claimant was capable of sedentary work was not supported by substantial evidence.

In the instant case, Dr. Stoker, Mrs. Predki's treating physician for four years,

has stated his opinion that, given her medical condition, the plaintiff is permanently disabled for any work situation except perhaps clerical work in her home. Neither Dr. Grais, her treating cardiologist, nor Dr. Bacalla, the consulting physician, gave any opinion at all regarding plaintiff's residual functional capacity or whether she is disabled by her impairments. The ALJ, apparently relying on the diagnoses of Dr. Grais and Dr. Bacalla, found that the plaintiff's arthritic symptoms are not a serious impairment and that her heart condition is well controlled by medication. The ALJ further found, based solely on his own interpretation of the plaintiff's medical history, that she retains the capacity for a full range of light work.

Because the only medical evidence in the record regarding plaintiff's residual functional capacity is found in Dr. Stoker's letters, this Court holds that the ALJ's decision is not supported by substantial evidence. As described above, the ALJ proceeded to the fifth and final step of the sequential evaluation, and found Mrs. Predki disabled by applying the light work grid to her age, education and past employment. Application of the grids is useful only where each of the underlying criteria listed in the grid used match up to the plaintiff's characteristics and capacity. *Perez*, 653 F.2d at 1001. Because the ALJ's decision that plaintiff is capable of performing the full range of light work is not supported by substantial evidence, the Secretary's determination that plaintiff is not disabled must be reversed.

*Remand for Introduction of New Evidence*

The final question for this Court is whether to remand this case to the Secretary for further development of the medical evidence. Under 42 U.S.C. § 405(g),

The court may, on motion of the Secretary made for good cause shown before he files his answer, remand the case to the Secretary for further action by the Secretary, and it may at any time order additional evidence to be taken before the Secretary, but only upon a showing that there is new evidence which is material and there is good cause for failure to incorporate such evidence into the record in a prior proceeding....

Despite these apparent limitations on the court's remand power, courts frequently remand social security disability cases for additional evidence. *See, e.g., Strittmatter v. Schweiker*, 729 F.2d 507 (7th Cir.1984); *Perez*, 653 F.2d at 1002.

In *Strittmatter*, the ALJ had ended his inquiry at the third stage; relying solely on one doctor's statement that the patient could work while sitting down, he found that the claimant was able to perform her past relevant work. The Seventh Circuit held that the ALJ was required to determine the physical demands of the particular type of sedentary work that the claimant had done and then compare those demands to her present capabilities. Therefore, the court directed the district court to remand the case to the Secretary for additional findings on Mrs. Strittmatter's capability to do her former work. *Id.* at 509.

While there are cases which hold that 42 U.S.C. § 405(g) precludes a remand for additional evidence unless there is a showing of new material evidence and a good reason for its earlier omission, *Carroll v. Secretary*, 705 F.2d 638 (2d Cir.1983); *Czubala v. Heckler*, 574 F.Supp. 890 (N.D.Ind.1983), the Seventh Circuit recently explained its more liberal interpretation of the statutory remand provision. In *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir.1984), the Seventh Circuit stated:

The Social Security Act, as amended in 1980, provides for remand of cases in several situations, none of which clearly apply in this case.... However, other courts have held and the legislative history indicates that remand is also proper when the findings of the Secretary are not supported by substantial evidence but do not provide sufficient evidence to support a reversal and a finding that the claimant is disabled. *See Abeuf v. Schweiker*, 649 F.2d 107, 115–116 (2d Cir.

1981); H.R.Rep. No. 96–100, 96th Cong., 1st Sess. 13 (1979). *Id.* at 610 n. 8.

██ Under the standard set forth in *Garfield,* a remand of the instant case is appropriate. There is no evidence in the administrative record to controvert Dr. Stoker's opinion that the plaintiff is disabled. In Dr. Grais' April 17, 1981 letter to Dr. Stoker, however, he does state that Mrs. Predki's heart condition is under control with Digoxin and Inderal and that she suffered no significant reactions to an exercise test (R. 103). Similarly, Dr. Bacalla found that plaintiff's chest pain is "unrelated to exertion and relieved with rest" (R. 105). Under these circumstances, additional evidence is necessary to determine the type of work, if any, of which plaintiff is capable, given her heart condition and drug side effects.

██ Furthermore, on remand the ALJ should adhere to the Seventh Circuit's reminder in *Strittmatter, supra,* that where a claimant has non-exertional impairments as well as an exertional impairment, the ALJ should determine disability with the *aid* of the grid, but not limited to strict application of the grids. 729 F.2d at 508–09. The side effects of medication, such as drowsiness, are considered non-exertional impairments. *Cowart v. Schweiker,* 662 F.2d 731 (11th Cir.1981). Since the grids in Appendix II classify jobs according to their exertional impairments, the ALJ must determine if plaintiff's non-exertional impairments significantly narrow the range of work for which plaintiff is qualified. 20 C.F.R. part 404, subpart P, appendix II, § 200.00(e)(1)(2) (1985).

As stated earlier, when the ALJ has reached the fifth stage of the sequential evaluation, the Secretary has the burden of producing evidence to show that the claimant is able to perform alternate substantial gainful work that exists in the national economy. On remand, the Secretary is directed to secure additional evidence regarding plaintiff's residual functional capacity.

Reversed and remanded.