98 F.3d 1348
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Timothy G. WILD, Plaintiff-Appellant,
v.
Shirley S. CHATER, Commissioner, Social Security
Administration, Defendant-Appellee.
 No. 95-35521.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 10, 1996.
Decided Oct. 1, 1996.
 
 Before: REAVLEY,* REINHARDT and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Wild appeals a determination by an administrative law judge that he is not disabled within the meaning of the Social Security Act, and, therefore, he is not entitled to benefits. On a magistrate's recommendation, the district court affirmed. Wild appeals to this court. We affirm.
 
 
 3
 We review the district court's decision de novo, and therefore, independently examine the Commissioner's decision to determine whether it is free from legal error and whether it is supported by substantial evidence.[1] " 'Substantial evidence' means 'more than a scintilla,' but 'less than a preponderance.' "[2]
 
 A. The opinion of Dr. Boone
 
 4
 Initially, Wild asserts that the ALJ erroneously rejected a conclusion made by one of his treating physicians, Dr. Boone. On March 10, 1992, Dr. Thomas Boone filed a telephonic report with the Office of Disability Insurance concerning Wild's injuries. In that report he notes that he had seen Wild over a period of several months for Wild's back pain, as well as consulted with Dr. Cleary, another treating physician. He found that "[Wild] does have chronic low back pain from an industrial injury but most likely is going to be employable." On September 9, 1992, Dr. Boone filed a report with the Office of Disability Insurance, in which he indicated that he did not believe Wild was disabled at that time. However, on a Cigna Insurance form filed after Dr. Boone's November 10, 1992 examination of Wild, Dr. Boone checked two boxes on the form indicating that Wild was totally disabled from his regular occupation and that he was totally disabled from any occupation. No notes indicate why Dr. Boone changed his diagnosis.
 
 
 5
 Following Dr. Boone's first report, the record includes a notation of a March 30 examination by another physician, presumably Dr. Cleary. The notes indicate that Wild was emotionally distraught concerning his condition at the meeting and the examining physician referred Wild to the Medical Health Center for psychological evaluation. The examining doctor's prognosis includes the following notation,
 
 
 6
 [Patient] should probably be considered permanently disabled. I do not consider him a candidate for surgical intervention. If the epidural steroids to [sic] not work then our last option would probably be to recommend L & I referral to a chronic pain clinic, ideally on a domiciliary basis for a short period of time w/multi-disciplinary approaches to attempt to control his chronic pain patterns.
 
 
 7
 There was no reference to this diagnosis by Dr. Boone, and as previously noted, Dr. Boone's report following this notation indicated that Wild was not permanently disabled.
 
 
 8
 In addition to Dr. Boone, Wild was referred to Dr. Severinghaus, a psychologist, for "psychodiagnostic evaluation of a chronic pain condition" in July of 1992. Dr. Severinghaus reviewed Wild's medical records, including Dr. Cleary's notations above. Dr. Severinghaus concluded that Wild's "responses and behavior in [the] evaluation suggests a strong likelihood of malingering or faking bad." The psychologist was of the opinion that Wild distorted his responses to the evaluation, including his pain. Dr. Severinghaus noted,
 
 
 9
 While [Wild] tells me he is experiencing 'quite a bit' of pain today, he is able to sit for two hours with a short break and I observe no body shifting, discomfort, or pain behaviors. I note he chooses an overstuffed chair to sit in during the interview. He does not wince, grimace, or groan. During the testing he inadvertently drops a puzzle piece at two different times and leans over quickly and easily, with no indication of pain, to pick each piece up. Once he leans far back in his chair and pushes his feet out far in front of him to stretch; this strikes me as an unusual behavior for someone with low back pain.
 
 
 10
 In March of 1993, Wild was examined by Dr. Bot, a psychiatrist. Dr. Bot was of the opinion that "Wild is probably wanting to look as disabled as possible both from a physical and emotional standpoint for the purposes of this evaluation."
 
 
 11
 The ALJ rejected the notations on the insurance form by Dr. Boone, finding, "[t]he objective and clinical findings of the treating physician do not evidence a change in condition which would explain the change in residual functional capacity, the objective and clinical findings do not evidence a basis for the new assessment, and the assessment is clearly based on the subjective complaints of the claimant, who is not credible." "Where an ALJ chooses to disregard the opinion of a treating physician's opinion, he must set forth clear and convincing reasons for doing so if the treating physician's opinion is not contradicted by another doctor."[3] "Even when another doctor's opinion contradicts the opinion of a treating physician, an ALJ can disregard the latter only by articulating 'specific, legitimate reasons for doing so that are based on substantial evidence in the record.' "[4]
 
 
 12
 The ALJ correctly points out that Dr. Boone's evaluation of Wild remained consistent (that Wild was not permanently disabled) until the insurance form was completed. Only on this form is there any indication otherwise by Dr. Boone, and there is no explanation for Dr. Boone's change of opinion in the record. Additionally, the two examining psychiatric professionals found that Wild was malingering and attempting to "look as disabled as possible from both a physical and emotional standpoint." There is substantial evidence to support the ALJ's finding.[5]
 
 
 13
 In a separate complaint, Wild asserts the ALJ erroneously concluded that he was not credible. Wild's argument is based upon a psychological report prepared in 1986 by Dr. Klein who stated that Wild "is not likely to form insight, or to grasp abstract metaphors, or even to remember what is said to him in a treatment sessions [sic] even a few hours after it ended." The finding of Wild's lack of credibility was based upon evidence that Wild was malingering or potentially fabricating the nature of his disability. In addition to the psychological evidence above, there was other independent evidence of Wild's lack of credibility. In 1985, Wild described himself as a "chronic, habitual liar." Later in 1987, he filed an insurance claim contending that he had been injured at work when a tree rolled onto him. A year later Wild informed his lawyer that he had been "faking his disability." Additionally, Wild's explanation of his injuries in February and March of 1991 to various medical professionals were inconsistent. The Mount Carmel Hospital outpatient record indicates that the accident was caused when Wild was struck on his head and neck by a "slab or rock." However, in March of 1991, Wild informed Dr. Gray that his injury "took place at the mine when he was struck with a beam while wearing a hard hat." In July of 1991, he was examined by Dr. Clark. Wild informed Clark that he had been in his "usual state of health, doing fairly well, until March of this year," when he suddenly blacked out and fell backward into a hole 3-4 feet deep. However, none of the many examinations in March or April refer to Wild's "fall." There is considerable evidence of Wild's lack of credibility.
 
 
 14
 B. Wild's I.Q.
 
 
 15
 Next, Wild argues that he met the requirements of Section 12.05(C) ( 20 C.F.R. 404, Subpt. P, App. 1) because he had a "physical or mental impairment imposing additional and significant work-related limitation of function," and he had an I.Q. of 60 through 70. Having met these two requirements, he believes that he is eligible for benefits. Wild declares that he was twice tested at 70 and 68 in 1986 and 1993, respectively. To meet the requirements under § 12.05(C), there must be a "valid" I.Q. of 60 through 70. The ALJ rejected the IQ scores based upon Dr. Severinghaus's opinion that,
 
 
 16
 [Wild] achieves a WAIS-R Full Scale IQ of 68, which falls in the Mild Mental Retardation range, yet his responses and performance are highly inconsistent on each subtest, in that he misses extremely easy items and passes much harder one. Also, his use of language and concepts is inconsistent with that of someone who is mildly retarded.... While the results of my evaluation suggest [Wild] is malingering or faking bad, while the notes of his physicians suggest they feel his problems are genuine.
 
 
 17
 Similarly, Dr. Bot agreed,
 
 
 18
 It has been alleged that [Wild] is mildly and mentally retarded. He does not come across in this fashion in his interview with me. He rather appears more of low average of intelligence. Borderline intellectual function is a possibility but again he appears to be of low average intelligence.
 
 
 19
 Wild asserts that the two I.Q. scores should not be discarded, for two reasons. First Dr. Severinghaus did not find Wild to be "malingering," and second, because there is no significant discrepancy in the scores of both tests. We disagree. The findings cited above by Dr. Severinghaus and Dr. Bot support the ALJ's decision, especially when combined with Wild's complete lack of credibility.[6]
 
 C. Alternative Jobs
 
 20
 Finally, Wild asserts that the Secretary did not meet her burden because she failed to demonstrate that alternate jobs exist within Wild's residual functional capacity. The ALJ relied upon § 202.18, Part 404, Subpart P., Appendix 2, Table No. 2, and found that Wild was not disabled. Implicitly, the ALJ found that Wild had "maximum sustained work capability limited to light work as a result of severe medically determinable impairment," he was a younger individual, he did not have a high school education but was able to communicate in English, and he was a skilled or semiskilled worker whose skills were not transferable.
 
 
 21
 Where a claimant suffers only an exertional impairment, then the ALJ must apply the grids in determining whether the claimant is disabled.[7] Where the claimant only suffers a non-exertional impairment, the grid does not answer the question of disability and other testimony is required.[8] The difficulty begins where a claimant suffers from both exertional and non-exertional impairments. In this case it is conceded that Wild suffers from both; however, the extent of his non-exertional disability was disputed. In Cooper, the court noted,
 
 
 22
 [I]f the exertional impairments alone are insufficient to direct a conclusion of disability, then further evidence and analysis are required. In such cases, the ALJ must use the grids as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the non-exertional limitations." [Cite omitted]. In short, the grids serve as a ceiling and the ALJ must examine independently the additional adverse consequences resulting from the nonexertionary impairment.[9]
 
 
 23
 However, the non-exertional impairment must be "sufficiently severe."
 
 
 24
 "A non-exertional impairment, if sufficiently severe, may limit the claimant's functional capacities in ways not contemplated by the guidelines. In such a case the guidelines would be inapplicable."[10] The severity of the non-exertional limitations was disputed. The ALJ found specific exertional impairments and that,
 
 
 25
 the claimant's mental impairments further limit his ability to accept instructions and respond appropriately to criticism form [sic] supervisors and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.... Accordingly, [the ALJ] finds that the claimant is unable to perform work requiring more than a limited range of light exertion. [The ALJ] further finds that the claimant is unable to perform his past relevant work which required more than light exertion.
 
 
 26
 To determine whether Wild was disabled, the ALJ looked first at whether Wild met the test under the grids, and upon finding that he was not disabled under the grids, the ALJ examined the severity of the non-exertional limitations upon the exertional limitations. The ALJ found that the non-exertional limitations do not "further significantly erode the occupational base," essentially holding that the non-exertional limitations were not "sufficiently severe" to require the testimony of a vocational expert. The evidence supports that finding and further evidence by a vocational expert was not required.
 
 
 27
 Affirmed.
 
 
 28
 REINHARDT, Circuit Judge, dissenting.
 
 
 29
 I respectfully dissent.
 
 
 30
 Assuming arguendo that everything else in the majority's disposition is correct, I believe that in light of the claimant's undisputed non-exertional impairments, the ALJ was required to call a vocational expert under our decision in Cooper v. Sullivan, 880 F.2d 1152 (9th Cir.1989). I would remand to the ALJ for further proceedings.
 
 
 
 *
 Honorable Thomas M. Reavley, Senior United States Circuit Judge for the United States Court of Appeals, Fifth Circuit, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir.1996)
 
 
 [2]
 Id. (internal citations omitted.)
 
 
 [3]
 Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir.1991)
 
 
 [4]
 Baxter, 923 F.2d at 1396 (quoting Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.1989))
 
 
 [5]
 Wild asserts that the ALJ improperly considered as substantial evidence the opinion of a non-examining, non-treating psychologist, Dr. Neils. The ALJ, contrary to Wild's contention, relied upon both Dr. Severinghaus (who examined Wild) and Dr. Bot (who interviewed Wild and reviewed Wild's medical records). In fact, the ALJ found that Dr. Neils's opinion was supported by "the assessment of the examining psychologist who actually performed the tests and who had an opportunity to observe [Wild's] test-taking behavior." "We have held that the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." Saelee v. Chater, --- F.3d ----, ----, 1996 WL 452666, * 3 (9th Cir.1996)
 
 
 [6]
 See Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir.1992) ("This court, however, has recognized that a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record in the claimant's daily activity and behavior."); Soto v. Secretary, 795 F.2d 219, 222 (1st Cir.1986) (Secretary "is not obliged to accept results of claimant's I.Q. tests if there is a substantial basis for believing that claimant was feigning the results."); Strunk v. Heckler, 732 F.2d 1357, 1360 (7th Cir.1984) (ALJ could reject I.Q. test.)
 
 
 [7]
 Cooper v. Sullivan, 880 F.2d 1152, 1155 (9th Cir.1989)
 
 
 [8]
 Id
 
 
 [9]
 Cooper, 880 F.2d at 1155-56
 
 
 [10]
 Penny v. Sullivan, 2 F.3d 953, 958-59 (9th Cir.1993); Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir.1988)