**FILED**
**United States Court of Appeals**
**Tenth Circuit**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

**February 21, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

_____

LORI ANN FAGER,

    Plaintiff - Appellant,

v.

COMMISSIONER, SSA,

    Defendant - Appellee.

No. 24-1133
(D.C. No. 1:23-CV-00778-STV)
(D. Colo.)

_____

### ORDER AND JUDGMENT[*]
_____

Before **MATHESON**, Circuit Judge, **LUCERO**, Senior Circuit Judge, and **PHILLIPS**, Circuit Judge.

_____

The district court affirmed the Commissioner's denial of Lori Ann Fager's application for Supplemental Security Income ("SSI") benefits. She appeals. Exercising jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g), we affirm.

## I. Background

Ms. Fager has a bachelor's degree in anthropology and past relevant work as a legal secretary and housekeeper. She filed her SSI application in June 2017 with an

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

alleged disability-onset date of January 11, 2017, at age 42. She claimed that a back injury, anxiety, and obesity limited her ability to work. After the agency denied her application initially, an administrative law judge ("ALJ") denied benefits, but the Appeals Council of the Social Security Administration ("SSA") remanded for further proceedings. The ALJ again denied benefits. The Appeals Council denied review, but the district court granted the Commissioner's unopposed motion to reverse and remand for further proceedings.

On remand, a different ALJ held a hearing in December 2022 and denied benefits in a January 2023 written decision, which is the decision at issue in this case. In her decision, the ALJ followed the five-step sequential evaluation process used to review disability claims. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (explaining five-step process). At step one, the ALJ found Ms. Fager was not engaged in any substantial gainful activity. At steps two and three, the ALJ found Ms. Fager has multiple severe impairments—obesity, degenerative disc disease of the cervical and lumbar spine, plantar calcaneal spur on the left ankle, moderate obstructive lung disease, chronic pain syndrome, depression, and anxiety—but none of her impairments, alone or in combination, met or medically equaled the severity of one of the impairments listed as disabling in the Commissioner's regulations. The ALJ then found that although Ms. Fager's impairments could reasonably be expected to cause some of her alleged symptoms, her testimony about the intensity, persistence, and limiting effects of those symptoms was not entirely consistent with the record evidence.

2

After reviewing the evidence, the ALJ found Ms. Fager had the residual functional capacity ("RFC") to perform sedentary work subject to multiple limitations. Relevant to this appeal are the limitations the ALJ found concerning her nonexertional impairments—"[s]he can understand, remember, and carry out unskilled instructions that can be learned in 30 days or less"; she "can sustain concentration, persistence, and pace to these instructions for 2-hour intervals with . . . 15-minute morning and afternoon breaks and a 30-minute lunch break"; "[s]he can have occasional but noncollaborative interactions with coworkers and supervisors"; and she "can have occasional interactions with the general public." App. vol. 5 at 1248.

At step four, the ALJ found that with this RFC, Ms. Fager could not perform her past work as a receptionist, but at step five the ALJ found she could perform other jobs that exist in significant numbers in the national economy. The ALJ consulted a vocational expert ("VE") who identified several representative occupations a hypothetical individual with Ms. Fager's RFC could perform: final assembler, addresser, and touch up screener. The ALJ found Ms. Fager not disabled within the meaning of the Social Security Act and denied SSI benefits.

The Appeals Council denied review. Ms. Fager then filed an action in the district court, which affirmed the Commissioner's decision. This timely appeal followed.

## II.  Standard of Review

"We review the district court's decision de novo and independently determine whether the ALJ's decision is free from legal error and supported by substantial evidence." *Fischer-Ross*, 431 F.3d at 731.  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Barnett v. Apfel*, 231 F.3d 687, 689 (10th Cir. 2000) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high," but it is "more than a mere scintilla." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (internal quotation marks omitted).  We cannot "reweigh the evidence" or "substitute our judgment for that of the agency." *Barnett*, 231 F.3d at 689 (internal quotation marks omitted).

## III.  Discussion

### A.    ALJ's evaluation of mental impairments and related treatment records

The first and second of the three issues Ms. Fager raises on appeal involve the ALJ's evaluation of four medical opinions concerning her mental functional capacity and the ALJ's characterization of related treatment records.  Her point appears to be that if the ALJ had properly weighed these opinions and properly characterized the treatment records, the ALJ would have found Ms. Fager disabled because the RFC would have included a limitation the VE said would eliminate all jobs—having one or two emotional breakdowns at work each day lasting 15 to 30 minutes.  We first describe the four opinions and the ALJ's evaluation of them, and then address

4

together Ms. Fager's arguments regarding that evaluation and the ALJ's

characterization of the related treatment records.

### 1.  Opinion evidence

On September 9, 2017, David Fohrman, M.D., performed a consultative

examination of Ms. Fager.  He noted that Ms. Fager's complaints included anxiety,

depression, difficulty sleeping, and poor energy.  He found she had (1) "mild

impairment in her capacity to do one or two-step tasks"; (2) "moderate impairment in

social interactions due to depression and anxiety as evidenced by interactions with

[him] and self-report"; (3) "moderate to marked impairment in her ability to [do]

complex tasks with sustained attention based on clinical history and results of

concentration and memory evaluation (as evidenced by difficulty with serial sevens

and[] only remembering two of three words at five minutes and digits backwards)";

and (4) "marked impairment with consistently putting forth effort in work-related

activities due to severe depression and anxiety."  App. vol. 3 at 538.  He also stated

that her "depression appears to be due to chronic pain" and she "has an anxiety

disorder which is exacerbating her degree of functional impairment.  These

psychiatric condition[s] are associated with marked global impairment in social and

occupational functioning."  *Id.*  He added "[i]t is highly likely that co-occurring

medical problems (especially chronic pain) are exacerbating [her] degree of

functional impairments."  *Id.*

Some two weeks later, on September 20, 2017, a state agency psychologist,

Anne Naplin, Ph.D., reviewed Ms. Fager's available medical records and completed a

mental RFC assessment.  Dr. Naplin viewed Dr. Fohrman's opinion as "an overestimate of the severity of [Ms. Fager's] restrictions/limitations."  App. vol. 1 at 107.  Dr. Naplin found Ms. Fager had no more than moderate limitations in her ability to (1) understand, remember, and carry out detailed instructions; (2) sustain concentration and persistence; (3) interact appropriately with the general public; and (4) accept instructions and respond appropriately to criticism from supervisors. Dr. Naplin found Ms. Fager could perform with adequate concentration, persistence, and pace "[a]s long as work duties are not too complex."  *Id.* at 105.  She also found Ms. Fager "should have occasional contact with [the] general public" and could "accept instructions & criticisms from supervisors if the contact is not frequent or prolonged."  *Id.* at 106.  She added that Ms. Fager's attendance and pace limitations would not prevent her from completing a normal workday or workweek or significantly reduce pace provided that the "work does not involve tasks of more than limited complexity and attention to detail that require up to [one-half] year time to learn techniques, acquire information and develop facility needed for an average job performance."  *Id.*

Beginning in August 2018 and extending through October 2022, Lisa Geisterfer, a Licensed Professional Counselor ("LPC"), saw Ms. Fager for mental health therapy sessions, generally every week or two.  On November 30, 2020, Ms. Geisterfer completed a Mental Capacity Assessment ("MCA") form.  She found Ms. Fager had moderate limitations in her ability to interact with others and to understand, remember, or apply information; and marked limitations in her ability to

adapt or manage herself and to concentrate, persist, or maintain pace. Ms. Geisterfer found Ms. Fager's impairments would "substantially interfere with . . . her ability to work on a regular and sustained basis at least 20% of the time." App. vol. 4 at 990. She also found Ms. Fager could not "work on a regular and sustained basis in light of . . . her mental impairment" due to her "diminished ability to focus, concentrate, physical pain, social anxiety and co-occurent [sic] depression and anxiety already present," which would cause Ms. Fager to "be highly triggered – resulting in a dysregulated state." *Id.*

In February 2021, Joy Elizabeth DeJong Lago, Ph.D., conducted a neuropsychological evaluation of Ms. Fager that "revealed a pattern of mainly intact performance across cognitive domains, with the exception of a few areas of relative weakness that appear functional as opposed to organic in nature." App. vol. 5 at 1135. Dr. Lago characterized Ms. Fager's scores on various tasks as low average, average, high average, superior, very superior, within expectation, and well within expectation. Dr. Lago reported no more than some mild difficulties. Dr. Lago recommended that Ms. Fager should continue mental health therapy and "remain as physically, mentally, and socially active as possible." *Id.* at 1136. Dr. Lago stated that "[f]rom a strictly cognitive standpoint, [Ms.] Fager would not be considered unable to obtain or maintain competitive employment." *Id.*

In a letter dated December 5, 2022, Ms. Geisterfer stood by her 2020 opinion, stating as follows:

7

> [Ms. Fager] continues to have mitigating symptoms and diagnoses that makes working on a regular and sustained basis unfeasible. She continues to deal with chronic pain, depression, and anxiety. She has improved in her ability to manage the emotional overwhelm and panic that use[d] to be debilitating, however there is an on-going, underlying layer of depression that affects her. She has days where she feels better, has more focus, and less pain; these days are interspersed with more days where pain is intense, movement is difficult and her hope and mood are impacted. A regular and sustained work schedule would not be supportive to the accommodations she has to make on those days to support her mood and body.

App. vol. 8 at 1922. Ms. Geisterfer added that "[t]here is a strong link between chronic pain and depression," and "depression can aggravate pain's impact on the mind and body." *Id.*

## 2. ALJ's evaluation of opinion evidence

The ALJ found unpersuasive Dr. Fohrman's opinion that Ms. Fager has marked impairments in sustained attention and consistently putting forth effort in work activities because it was (1) "inconsistent with treatment records often showing largely normal examination findings and describing [Ms. Fager] as alert and attentive," and (2) inconsistent with Dr. Lago's neuropsychological evaluation "showing intact cognitive functioning and recommending significant physical, mental, and social activity." App. vol. 5 at 1254.

The ALJ also found unpersuasive Ms. Geisterfer's opinion: "The levels of limitations suggested in her report, including the marked levels of limitations suggested, are not supported by her own treatment records generally show[ing] stable mood and good functioning." *Id.* at 1255. The ALJ had summarized those notes earlier in the decision as follows:

> These therapy notes did indicate some worsening of symptoms during brief periods of situational stressors, family issues, or periods of grieving for family members or pets. Even during the periods, though, the claimant generally continued to have an overall stable mood, and she largely improved quickly after these periods. Most prominently, these records showed that the claimant had a stable mood, was cooperative, was functioning well, was adjusting well to changes, was showing good insight, and was homeschooling her children.

*Id.* at 1253 (citations and internal quotation marks omitted). The ALJ also explained

that Ms. Geisterfer's opinion was not "consistent with the many mild or normal

mental status findings in the other treatment records." *Id.* at 1255. The ALJ noted

that Ms. Geisterfer's opinion was partially based on Ms. Fager's physical pain and

condition, "the evaluation of which is beyond the scope of Ms. Geisterfer's treatment

and qualifications." *Id.* The ALJ further observed that Ms. Fager had on occasion

reported inaccurate information about her physical impairments. For example, she

once told Ms. Geisterfer she needed neck surgery, but the corresponding medical

records indicated only that a treating physician's assistant said she would review

Ms. Fager's imaging with the surgeons to rule out the need for surgery. The ALJ

determined that "the second-hand and inconsistent nature of medical information"

Ms. Geisterfer received "reduce[d] the probative value of any consideration of

[Ms. Fager's] physical condition in [Ms. Geisterfer's] assessment of [Ms. Fager's]

functioning." *Id.* The ALJ also found it "[n]otabl[e]" that a few months before

Ms. Geisterfer completed her 2020 MCA, one of her treatment notes indicated that

Ms. Fager needed paperwork for filing for disability and recited one of the

9

requirements for meeting a listed impairment, namely, marked limitation in two functional areas, or extreme limitation in one. *Id.* at 1254.

The ALJ found Dr. Naplin's opinion that Ms. Fager had mostly moderate limitations "largely persuasive." *Id.* at 1255. The ALJ explained that her opinion was "consistent with the record showing some difficulty with depression and anxiety that warrant[s] some level of limitation, but also showing mostly normal mental status findings that cannot be considered consistent with greater limits such as those suggested by Dr. Fohrman and Ms. Geisterfer." *Id.* But because of Ms. Fager's combined "depression and anxiety issues," the ALJ "incorporated slightly greater limitations in task complexity" than the half-year-learning-curve tasks Dr. Naplin had endorsed, finding that the "record as a whole warrants limitation to unskilled instructions that can be learned in 30 days or less." *Id.*

Finally, the ALJ observed that Ms. Geisterfer had assigned Ms. Fager Global Assessment of Functioning ("GAF") scores between 48 and 65, but only once was the score below 50, and it was often above 60. This, the ALJ explained, indicated "largely mild to moderate levels of impairment"[1] and constituted "further evidence

---

[1] A GAF score in the range of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Am. Psychiatric Ass'n, *Diagnostic & Stat. Manual of Mental Disorders* ("DSM") 34 (Text Rev. 4th ed. 2000) (boldface omitted). A GAF score in the range of 51–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* (boldface omitted). And a GAF score in the range of 61–70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational,

that [Ms. Fager's] mental impairments do not cause marked levels of limitation, and is more consistent with the opinion evidence from Dr. Naplin than the assessments from Ms. Geisterfer and Dr. Fohrman." *Id.* at 1256.

### 3. Ms. Fager's arguments

Ms. Fager first argues the ALJ should have given significant weight to Dr. Fohrman's opinion that she had moderate to marked limitations in several areas of mental functioning because it was supported by the record and consistent with the evidence. She points out that Dr. Fohrman performed a full psychological evaluation, took detailed notes, and connected her anxiety and depression with his conclusion. She adds that the regularity of her visits with Ms. Geisterfer "further supports Dr. Fohrman's opinion and shows that it is consistent with the record." Aplt. Opening Br. at 25.

Ms. Fager's argument implicates the two most important regulatory factors used to evaluate the persuasiveness of medical opinions and prior administrative medical findings—supportability and consistency. *See* 20 C.F.R. § 416.920c(b)(2). "Supportability" examines how closely connected a medical opinion or prior

---

or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well" with "some meaningful interpersonal relationships." *Id.* (boldface omitted). The current edition of the DSM, published in 2013, "abandoned the GAF" scale, "[b]ut the [SSA] still instructs ALJs to treat GAF scores as medical-opinion evidence." *Gerstner v. Berryhill*, 879 F.3d 257, 263 n.1 (7th Cir. 2018); *see also Emrich v. Colvin*, 90 F. Supp. 3d 480, 492 (M.D.N.C. 2015) ("In Administrative Message 13066 (AM–13066), effective July 22, 2013, the SSA acknowledged that the DSM had abandoned use of GAF scoring and instructed ALJs that they should still consider GAF scores as opinion evidence in some circumstances.").

administrative medical finding is to the evidence and the medical source's explanations: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." § 416.920c(c)(1). "Consistency," on the other hand, compares a medical opinion or prior administrative medical finding to the evidence: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical findings(s) will be." § 416.920c(c)(2).

Ms. Fager may be right that Dr. Fohrman adequately supported his opinion by connecting his conclusions to his exam findings.   But the ALJ did not find his opinion unpersuasive due to a lack of supportability.  Instead, the ALJ found Dr. Fohrman's opinion unpersuasive because it was "inconsistent with the treatment records often showing largely normal examination findings and describing [Ms. Fager] as alert and attentive."  App. vol. 5 at 1254.

In discussing records from providers other than Ms. Geisterfer, the ALJ found that in August 2017, "[p]sychiatric examination findings . . . were normal, including normal mood and affect, normal behavior, and normal thought content."  *Id.* at 1253. And "[l]ater 2017 psychiatric examinations showed isolated findings of agitation and depressed mood, but a quick return to normal findings."  *Id.*  The ALJ also found that other "[p]rimary care records show subjective reports of anxiety and depression, but

12

screens for the symptoms have shown improvement with prescription medication treatment, and [Ms. Fager] acknowledged improvement in anxiety." *Id.* The ALJ further found that "[t]hese records show largely normal psychiatric examination findings, including the latest records that describe [her] as alert, interactive, attentive, future-thinking, and having normal mood and behavior." *Id.*

As for Ms. Geisterfer's therapy notes, the ALJ acknowledged that they "indicate[d] some worsening of symptoms during brief periods of situational stressors, family issues, or periods of grieving for family members or pets," but "[e]ven during [these] periods" Ms. Fager "generally continued to have an overall stable mood" and "largely improved quickly after these periods." *Id.* (internal quotation marks omitted). Finally, the ALJ emphasized that "[m]ost prominently," Ms. Geisterfer's notes showed that Ms. Fager "had a stable mood, was cooperative, was functioning well, was adjusting well to changes, was showing good insight, and was homeschooling her children." *Id.*

Of all these records, which are rather voluminous and span from 2016 to 2022, Ms. Fager addresses only four of Ms. Geisterfer's treatment notes covering a five-week span in 2020 as support for her argument that substantial evidence does not support the ALJ's characterization of the mental health records. The first of those notes records Ms. Fager's mood as "stable" and refers to sleeping difficulties. App. vol. 8 at 1921. The next recites that she "had 2 very depressed days last week" but "worke[d] her way through" and has "[l]ayers of sadness" around "challenges in world, dad & his cancer, difficulties w/ kids, health challenges." *Id.* at 1919. The

13

third observes that she was "teary about daughter's struggle," had "sadness about daughter's depression and suicidal feelings," and had increased anxiety. *Id.* at 1918. And the fourth note states she "[b]rought up feelings of not being a good person" but "her mind swirling is much better." *Id.* at 1917 (internal quotation marks omitted).

These notes support Ms. Fager's assertion that she has good and bad days, a pattern that could conceivably prevent her from completing workdays or workweeks. But these notes do not overwhelm the other medical records the ALJ relied on in evaluating the consistency of Dr. Fohrman's opinion. *See Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987) ("Evidence is not substantial if it is overwhelmed by other evidence . . . ." (internal quotation marks omitted)). Nor does Ms. Fager's reliance on the mere regularity of her therapy sessions with Ms. Geisterfer. And having reviewed all of the treatment records pertaining to Ms. Fager's mental health, we conclude that substantial evidence supports the ALJ's characterization of them.

Ms. Fager also fails to address the additional reasons the ALJ found Dr. Fohrman's opinion unpersuasive—it was inconsistent with Dr. Lago's neuropsychological evaluation "showing intact cognitive functioning and recommending significant physical, mental, and social activity," App. vol. 5 at 1254, and with the bulk of the GAF scores Ms. Geisterfer had recorded. Those unchallenged reasons are sound and, together with the inconsistent treatment records, constitute substantial evidence supporting the ALJ's finding that Dr. Fohrman's opinion was not persuasive.

Ms. Fager next faults the ALJ for finding largely persuasive Dr. Naplin's opinion that Ms. Fager is no more than moderately limited in certain areas of mental functioning. She points out that Dr. Naplin never treated or examined her and instead formed an opinion based on only the "few treatment records . . . available at the time of her review in September of 2017." Aplt. Opening Br. at 25. Ms. Fager asserts that "[n]one of those records relate to psychological treatment" and claims that because Dr. Fohrman's report was "the only psychological record Dr. Naplin reviewed, she had little basis for protesting Dr. Fohrman's conclusions." *Id.*

This line of argument does not persuade us that the ALJ erred in the weight she assigned to Dr. Naplin's opinion. Plainly, "[a] medical source may have a better understanding of [a claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder." 20 C.F.R. § 416.920c(c)(3)(v). But as noted above, consistency with the record is one of the two most important evaluative factors, and it is *that* factor the ALJ relied on in finding Dr. Naplin's opinion largely persuasive and Dr. Fohrman's opinion unpersuasive.[2] Furthermore, Ms. Fager is wrong that none of the treatment records available at the time of Dr. Naplin's opinion relate to psychological treatment. On September 23, 2016, Ms. Fager presented to Cynthia Van Farowe, M.D., "*for*

---

[2] To the extent Ms. Fager implies the ALJ erred in not addressing the examination-relationship factor, she is mistaken. ALJs "are not required to . . . explain how [they] considered" that factor, § 416.920c(b)(2), unless they "find that two or more medical opinions . . . about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," § 416.902c(b)(3). Those prerequisites are not met here.

*depression and anxiety.*"  App. vol. 2 at 459 (emphasis added).  Dr. Van Farowe "prescribed [Ms. Fager] Lexapro 5mg" and encouraged her to "follow up in 2–3 weeks for medication check."  *Id.*  On October 16, 2016, Ms. Fager saw Dr. Van Farowe again, this time for complaints of wheezing, but Dr. Van Farowe reported that Ms. Fager "has been taking 10 mg Lexapro daily which has provided relief from her anxiety stating that she can problem solve better, get out of the house easier, is having less panic attacks and feels small set backs [sic] are less catastrophic." *Id.* at 462–63.

The remainder of the treatment notes the ALJ referred to that predate Dr. Naplin's opinion, all of which were written by Dr. Van Farowe, involved visits for various physical problems.  But they also show that Ms. Fager remained on Lexapro and, as the ALJ noted, document "largely normal [psychiatric] examination findings," App. vol. 5 at 1254.  Because Dr. Van Farowe had treated Ms. Fager for depression and anxiety, those findings are not, as Ms. Fager's argument suggests, irrelevant to the ALJ's analysis of Dr. Naplin's opinion for consistency with the other medical evidence.

Ms. Fager next argues that Dr. Naplin's explanation for her opinion was substantially flawed.  She asserts that, unlike Dr. Fohrman, Dr. Naplin "ignored the clinical history" and instead relied only on the results of Dr. Fohrman's evaluation. Aplt. Opening Br. at 26.  But we have just rejected the notion that Dr. Fohrman's evaluation was the only psychological record available to Dr. Naplin.  And even if Dr. Naplin did not review the available treatment notes, the relevant inquiry is

16

whether substantial evidence supports the ALJ's finding that Dr. Naplin's opinion is consistent with the other medical evidence and Dr. Fohrman's was not. There is substantial evidence in the record supporting that finding, namely, the treatment records (discussed above) that the ALJ identified as demonstrating largely normal psychological findings.[3]

Ms. Fager also takes issue with Dr. Naplin's reliance on Ms. Fager's ability to "'persist through the entire exam despite occasional tearfulness,'" *id.* (quoting App. vol. 1 at 105), as a reason for assessing only a moderate limitation in her ability to sustain concentration and persist throughout a normal workday and workweek. She notes that Dr. Fohrman recorded six separate occasions during his exam when she became tearful, and she points to the VE's testimony that having an average of one or two daily emotional breakdowns in the workplace each lasting 15 to 30 minutes would preclude work if the employee would not be able to persist in their work functions. In essence, this argument asks us to reweigh the evidence or substitute our judgment for the ALJ's. We cannot do either. *See Barnett*, 231 F.3d at 689. And the argument does not undermine our conclusion that substantial evidence supports the ALJ's finding that Dr. Naplin's opinion was largely persuasive because it was consistent with the other medical evidence.

---

[3] Ms. Fager further attempts to undermine Dr. Naplin's opinion by pointing out that she was "missing most of the evidence in this case when she rendered her opinion." Aplt. Opening Br. at 27. But the same can be said of Dr. Fohrman. In any event, the issue is whether substantial evidence supports the ALJ's decision that their opinions were or were not consistent with the medical evidence regardless of whether that evidence was produced before or after they rendered their opinions.

17

Ms. Fager also argues that the ALJ erred in finding that the limitations Ms. Geisterfer endorsed were "based at least in part on [Ms. Fager's] physical pain and her physical condition, the evaluation of which is beyond the scope of Ms. Geisterfer's treatment and qualifications." App. vol. 5 at 1255 (internal quotation marks omitted). She contends that Ms. Geisterfer's area of expertise includes pain because the SSA has acknowledged a connection between psychology and pain. In support of that contention, she cites to section DI 22510.011 of the SSA's Program Operations Manual System ("POMS").[4] She also cites two cases she says supports this connection: *Wild v. Chater*, No. 95-35521, 1996 WL 560104 (9th Cir. Oct. 1, 1996) (unpublished), and *Sommerville v. Astrue*, No. 06-1110, 2007 WL 2176007 (D. Kan. July 24, 2007) (unpublished).

This argument fails. A medical source's area of expertise is among the factors an ALJ may consider when evaluating opinion evidence. *See* 20 C.F.R. § 416.920c(c)(4) ("The medical opinion . . . of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion . . . of a medical source who is not a specialist in the relevant area of specialty."). The POMS provision Ms. Fager cites offers a definition of "pain specialist": "A pain specialist may be an orthopedist, a neurologist, a neurosurgeon, a physiatrist, a psychiatrist, etc., but is different from others in these fields because of" either

---

[4] The POMS is "a set of policies issued by the [SSA] to be used in processing claims." *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999).

18

"[s]pecial training in pain," "[s]pecial experience in clinical management of pain," or "[r]ecognition within the specialty as an expert in pain and pain management." POMS DI 22510.011(A)(1).

Ms. Geisterfer is an LPC.  For the sake of argument, we assume an LPC could fall within the POMS definition of "pain specialist."  But Ms. Fager points to no record evidence that Ms. Geisterfer has any special training, special experience, or recognition as a pain expert that differentiates her from others in her field and marks her as a pain specialist under the POMS definition.  The POMS definition, therefore, is inapposite.  And because Ms. Geisterfer is an LPC, the cases Ms. Fager relies on are unpersuasive because neither involved an LPC.  In *Wild*, the claimant "was referred to . . . a psychologist[] for a psychodiagnostic evaluation of a chronic pain condition."  1996 WL 560104, at *1 (internal quotation marks omitted).  The Ninth Circuit credited the psychologist's opinion as among the substantial evidence supporting the ALJ's decision.  *See id.* at *2.  In *Sommerville*, the district court concluded that "psychologists can evaluate claims of pain" and rejected the ALJ's contrary position.  2007 WL 2176007, at *5.  We therefore conclude the ALJ permissibly concluded that Ms. Geisterfer's endorsement of limitations based at least in part on Ms. Fager's physical pain or physical condition were beyond the scope of Ms. Geisterfer's qualifications and permissibly relied on that factor as one basis for finding her opinion unpersuasive.[5]

---

[5] As noted above, the ALJ also discounted Ms. Geisterfer's opinion because Ms. Fager had reported allegedly inaccurate information regarding her physical

**B.      ALJ's reliance on Dr. Lago's opinion**

Ms. Fager takes issue with the ALJ's handling of Dr. Lago's statement that "[f]rom a strictly cognitive standpoint, [Ms.] Fager would not be considered unable to obtain or maintain competitive employment."  App. vol. 5 at 1136.  The ALJ found this "opinion . . . generally persuasive as it is supported by the IQ and General Ability Index scores and the performance in other testing noted by Dr. Lago." *Id.* at 1254.  Ms. Fager claims Dr. Lago's statement was not a medical opinion addressing work-related limitations but a conclusion that Ms. Fager could work, which is a determination specifically reserved to the Commissioner by 20 C.F.R. § 416.920b(c)(3)(i).  She therefore posits that the ALJ erred by finding it persuasive.

We disagree.  The ALJ recognized that Dr. Lago's statement about Ms. Fager's cognitive limitations was "quite narrow," and the ALJ considered it in conjunction with "the results of [Dr. Lago's] evaluation as a whole in the context of

---

impairments.  The Commissioner notes this rationale but argues that because Ms. Fager did not address it in her opening brief, she has waived appellate review of it.  We agree.  *See Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020) ("Issues not raised in the opening brief are deemed abandoned or waived." (internal quotation marks omitted)).  Although Ms. Fager raises the issue in her reply brief, that effort comes too late.  *See Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 676 n.9 (10th Cir. 2016) ("We generally do not consider arguments raised for the first time in a reply brief.").  But even if she had properly raised the issue, its resolution would not alter the outcome of this appeal because she has not shown reversible error in any of the other grounds on which the ALJ relied in finding Ms. Geisterfer's opinion unpersuasive, including (1) the most important regulatory factor, inconsistency with the record, and (2) the ALJ's finding that Ms. Geisterfer's opinion was rendered not long after she recorded in her treatment notes the level of impairment necessary to gain eligibility for SSI benefits, which suggests the ALJ suspected Ms. Geisterfer of inflating the degree of Ms. Fager's impairments.

other evidence in the record." App. vol. 5 at 1254. Clearly the ALJ was not accepting Dr. Lago's statement as an ultimate conclusion that Ms. Fager could not work but as an opinion on a narrow issue—the functional effect of Ms. Fager's cognitive limitations, which was that they would not, alone, preclude work. Moreover, Dr. Lago followed the disputed statement with the caveat that she "defer[red] back" to Ms. Fager's other providers regarding medical and psychological limitations, *id.* at 1136, confirming that her opinion regarding Ms. Fager's cognitive limitations was just one portion of a functional-limitations analysis.

## IV. Conclusion

We affirm the district court's judgment. We grant Ms. Fager's motion for leave to proceed on appeal without prepayment of costs or fees.

Entered for the Court

Gregory A. Phillips
Circuit Judge